285 P.2d 605

PHELPS DODGE CORPORATION, DOUG-LAS REDUCTION WORKS, Petitioner,

v.

Mrs. Carmen R. CABARGA, Widow, Antonio Cabarga, Elias Cabarga, Isidoro Cabarga, Carmen Teresa Cabarga, Thomas Ramon Cabarga, and Jose Manuel Cabarga, Minor Children, and The Industrial Commission of Arizona, Respondents.

No. 5958.

Supreme Court of Arizona.

June 28, 1955.

Evans, Hull, Kitchel & Jenckes, Denison Kitchel and William H. Rehnquist, Phoenix, for petitioner.

John Pintek, Bisbee, for respondents Cabarga.

John R. Franks, Phoenix, for respondent Industrial Commission of Arizona. Donald J. Morgan, Robert K. Park, Phoenix, and John F. Mills, Prescott, of counsel.

LA PRADE, Chief Justice.

Certiorari to review an award of the Arizona Industrial Commission granting death benefits to the widow and minor children of Ysidoro P. Cabarga, deceased.

The decedent at the time of his death was an employee of the petitioner, Phelps Dodge Corporation, Douglas Reduction Works, at Douglas, Arizona. It is admitted that the injury suffered by deceased and from which he died, arose out of and occurred in the course of the employment, but it is contended by the employer that the injury was not an "injury by accident". The findings to this effect are challenged as not being supported by the evidence but contrary thereto and contrary to law.

On March 30, 1953, deceased, while performing his usual and ordinary duties as a slag switchman, suffered a coronary occlusion which resulted almost immediately in his death.

We believe it will be helpful and enlightening to briefly describe the situs and attendant conditions of the employment, as shown by the evidence before the Commission. This factual background, together with the medical findings, is the basis for the Commission's finding that the injury and resulting death was by accident. Our ultimate holding is that the coronary occlusion induced or contributed to by the usual and ordinary work performed was the accident or accidental death.

The ore which defendant-employer processes at its smelter is heated in reverberatory furnaces to a temperature which makes it molten. Liquid slag—the waste portion of the molten ore—is drained out of the furnaces into slag-pots mounted on cars which move on rails. These cars are pulled by an electric locomotive to a slag dump. Each slag train is manned by a slag motorman and a slag switchman.

A slag switchman has three principal duties. He throws switches, acts as a lookout and assists in rerailing cars which frequently are derailed during the journeys to and from the slag dump. The derailments result from molten slag being spilled.

on the track, hardening, and obstructing subsequent passage of the train. To cope with these derailments, each slag locomotive is equipped with two "frogs", one suspended on either side. These "frogs" are wedge-shaped metal bars, approximately two feet long and weighing about fifty pounds apiece. When a derailment occurs it is the routine duty of both the motorman and the switchman to remove the "frogs" from the side of the motor and to place them in such a position in relation to the track and the derailed wheels that the locomotive by virtue of the position of the two "frogs" can pull the car back onto the tracks. After the rerailment has been accomplished each crewman picks up a "frog" and places it back on the side of the locomotive.

Several witnesses testified that derailments are a frequent occurrence in the operation of a slag train. One witness related that he had experienced one derailment each day for four consecutive days.

The pot containing the molten slag is suspended on and between two sets of trucks. A truck is made up of four wheels, two on each side, attached to an axle frame. On the day in question two of the truck wheels became derailed, thus necessitating rerailing.

From the evidence it was made to appear that the lifting, pushing and pulling of the "frogs" on the ground (slag) so as to get them into place, requires much physical effort and strain. Motorman Dees, in describing the method and physical efforts expended in accomplishing a rerailment, testified as follows:

"Q. What position do you take to put a frog underneath those little railroad cars? A. Well, the frame of the pot goes very low to the ground, I would say approximately 18 inches, or lower than that, and you have to get down after you carry them frogs to whichever track you have to put them under, and you have to get down there between the wheels, or on the outside, you have to get down, and after you get down there you scratch the loose slag out with your gloves, and then you start sliding those frogs, which weigh 50 pounds in place, and when you are down on your knees and lifting that frog, that 50 pounds is pretty heavy, and you are pushing against the slag and you are kind of scraping it back out. It is an awkward position to get into, because of the crouch that you have to get into to push that frog into place."

Relative to the physical effort and strain involved Motorman Coons stated:

"Q. Now when you are lying down there like that, does it require any strain on you to move the frogs, when you are lying on your back (stomach)? A. I would say it does, because you only have your arms to work with."

The deceased at the time of his death was sixty-two years of age and apparently healthy and strong. No member of his family was aware of any heart trouble with which he might have been afflicted. He had a work record of practically no absences from work over a span of eighteen years (1½ days per year), and was in especially good spirits on reporting to work at 3 p. m. (death occurred at 5 p. m.).

Shortly preceding the death of Cabarga the slag-pot car in charge of Motorman Coons became derailed. These men went through the regular procedure of rerailing which on the first attempt was unsuccessful, necessitating a second attempt. It was then that Cabarga and Coons again took their respective places under the truck and rearranged and reset the frogs. From this evidence the Commission was entitled to believe that these men had for the second time put forth strenuous energy entailing lifting, pulling and straining, though not unusual or unexpected. After the frogs were set the motorman took his place in the cab of the motor. Cabarga stood back from the tracks and signalled him to start the motor of the engine which pulled the wheels back to the tracks. Coons then stepped from the cab and walked down one side of the tracks, picked up his frog, carried it back and hung it on the side of the motor. He then took a shovel and proceeded to clear away the slag on the track that had caused the difficulty. When this was accomplished he walked back to the cab and not hearing or seeing Cabarga walked to a position where he could see him. It was at this time that he saw Cabarga slumped to the ground opposite the pin on the motor on which the frog is usually suspended. Cabarga at this time was lying on the ground and apparently in great distress. Coons attempted artificial respiration but soon became aware of the fact that the man was in extremis. A doctor was called and shortly thereafter pronounced Cabarga dead from coronary occlusion. Lying on the ground near Cabarga was the frog which he had carried from the rear of the train to the pin on which he would have suspended it had he not become stricken.

Expert medical testimony was given by two doctors in answer to hypothetical questions which fairly stated the facts in regard to deceased's physical condition on the afternoon of the death and the work entailing lifting, pulling and pushing under strain. This testimony was to the effect that the death was contributed to by the work and strain undergone by the deceased immediately preceding the death. No contrary medical evidence was offered or received although one of the experts admitted on cross-examination that

"There are many deaths that are apparently due to cardiac failure from one reason or another that do occur without unusual strain."

Dr. Monroe H. Green negatived any idea that the death was from natural causes and merely coincidental in point of time with

152

the work performed. In this behalf he testified:

"\* \* \* I would say that while it is possible that such death was a coincidence occurring at that particular point and space in time, I consider it much more likely on the basis of what we know occurs in such types of death that the physical activity at the time of death or immediately prior to it was more likely the initiating factor."

It is the contention of the petitioner that the facts as disclosed do not show that the injury and subsequent death occurred "by accident" within the requirements of the statute, as interpreted in Pierce v. Phelps Dodge Corporation, 1933, 42 Ariz. 436, 26 P.2d 1017; Hartford Accident & Indemnity Co. v. Industrial Commission, 1947, 66 Ariz. 259, 186 P.2d 959; Jones v. Industrial Commission, 1950, 70 Ariz. 145, 217 P.2d 589, and other Arizona cases to the same effect. These cases interpreted the statute requiring that

"\* \* \* Every employee, hereinbefore designated, who is injured, and the dependents of every such employee who is killed, by accident arising out of and in the course of his employment, \* \* \* ." A.C.A.1939, § 56–931. (Also see secs. 56–930, 56–936 and 56–952.)

shall receive compensation to mean that the injury or death was to be preceded by a definite and discernible untoward event or unlooked for mishap to which the injury or death was ascribable. When these sequences followed each other it was held that the injury was "by accident". We are of the opinion that there is no occasion "as a matter of grammar" to read the phrase as if it referred to "*an* accident" and then proceed to conduct a search for "*the* accident" as an event separate and apart from the injury. In most cases of industrial injuries the two events are distinct and their separate existence and relationship not too difficult to discern. No difficulty is entailed when it is apparent that a distinct untoward event is the cause of the injury. But when as in the instant case the untoward event is the result, though directly attributable to the usual and ordinary strenuous work of the deceased, some difficulty is thought to exist. There are myriad reported cases turning around the controversy of "accidental cause" v. "accidental result". To apply the doctrine of the Pierce case to the facts of this case would require that no compensation is allowable, not on the ground that the death was not due to an industrial injury but solely on the ground that the death was not preceded by a recognizable untoward event producing or contributing to the result. Under this interpretation compensation is allowable for slipping and dying but not for straining or exercising and dying as a result of the effort or energy expended.

This court receded from the restrictive interpretation of the Pierce case in our case of In re Mitchell, 1944, 61 Ariz. 436, 150 P.2d 355, 361, which presented a

unique situation, wherein the deceased deliberately and intentionally and in the usual manner applied carbon tetrachloride in cleaning contact points on a telephone switchboard relay, the chemical used being highly volatile liberated deadly gases in the poorly ventilated structure where the work was being performed. The continued inhalation of the gases over a period of three or four days poisoned the employee and so affected his liver that he died as a consequence thereof. We held that the death was the basis for a compensable claim. It was there recognized that

"* * * The result (poisoning and resultant death) was undesigned and unexpected. It was therefore an event which took place without one's foresight or expectation and hence a fortuitous happening." (Parenthetical matter added.)

In so holding we repudiated the doctrine of the Pierce case wherein it was determined that compensation was only allowable for injury or death produced or contributed by an accident. It was determined and held that the death was accidental. The about-face was far from being capricious in that the new interpretation was in harmony with the early English cases on the subject and particularly with the declaration in Clover, Clayton & Co. v. Hughes (1910), A.C. 242, 3 B.W.C.C. 775, wherein Lord MacNaghten said that "* * 'injury by accident' meant nothing more than 'accidental injury'," and the majority of cases in this country following the English rule. See Larson's "The Law of Workmen's Compensation", Vol. 1, Section 38.20. This majority with which we concur hold that when usual exertion leads to something actually breaking or letting go with an obvious sudden organic or structural change in the body the injury is accidental. We so held in Phelps Dodge Corporation v. De Witt, 1945, 63 Ariz. 379, 162 P.2d 605. This case presented the situation of an employee accustomed to hard labor who in picking up a tire and rim weighing 70 to 100 pounds and throwing it into a truck immediately suffered a dislocated or hemorrhaged cervical cord, resulting in temporary partial paralysis. The wholly unexpected internal disabling disarrangement was the accident.

■ Of course the usual or unusual exertion must be of such quality or character and substance as to convince the fact-finding body that the injury can be traced thereto with such reasonable assurance that it can be said that the work or energy put forth caused or contributed to the injury. There must be a recognizable causal connection. The requirements of the statute will not be fulfilled merely because the employee dies on the job while doing some casual or physically inconsequential thing such as was developed in Rowe v. Goldberg Film Delivery Lines, 1937, 50 Ariz. 349, 72 P.2d 432, where the employee suffered a spontaneous pneumothorax while leaning over to pick up two small packages.

■ We believe that the findings of the Commission in this case are on principle

justified by and within the principles laid down in the De Witt case. The contrary enunciations in Jones v. Industrial Commission, supra, are disapproved.

The award is affirmed.

UDALL, WINDES, PHELPS and STRUCKMEYER, JJ., concur.