375 P.2d 384

**Earl C. WARE, Petitioner,**

v.

**The INDUSTRIAL COMMISSION of Arizona and S & W Construction Company, Respondents.**

**No. 7548.**

Supreme Court of Arizona,

En Banc.

Oct. 17, 1962.

Robert E. Yount, Scottsdale, for petitioner.

Lorin G. Shelley, Phoenix, for respondent The Industrial Commission of Arizona.

Donald J. Morgan, Edward E. Davis, C. E. Singer, Jr., Ben P. Marshall, Phoenix, of counsel.

JENNINGS, Justice.

By certiorari petitioner seeks review of an award of the Industrial Commission denying him compensation for an alleged injury by accident arising out of and in the course of his employment.

Earl C. Ware (hereinafter called petitioner) was employed by the S & W Construction Company as a general superintendent. At the time of his alleged injury he was 63 years old and had been employed by S & W Construction Company for approximately a year and a half. His duties generally were to help in anything which came along where it appeared that help was needed, including the mowing of lawns. While he was mowing a lawn on April 18, 1961 he suffered a cerebral thrombosis. The temperature on this date was 97 degrees and was the first hot day of spring. During the time petitioner was mowing the lawn he became thirsty frequently and drank water out of the hose whenever he felt the need. At the time of his collapse, petitioner was in the bathroom of a house getting a drink of water.

Petitioner filed his claim for benefits with the Commission alleging therein that he sustained injury on April 18, 1961 while employed by the defendant employer. On August 3, 1961, the Commission made and entered its Findings and Award for Non-compensable Claim, finding among other things "that said applicant did not sustain an accident arising out of and in the course of his employment within the meaning of the Workmen's Compensation Act, and therefore any personal injuries claimed in the premises are not compensable under the Act." The Commission "ordered that said applicant take nothing from the defendants by reason of his alleged personal injury." Petitioner protested the findings and award and filed an application for rehearing. On September 8, 1961 the petitioner, at the re-

quest of the Commission, was examined by a trio of physicians, Dr. E. Thornton Pfeil, Dr. George G. McKhann and Dr. James R. Moore, medical advisers to the Commission. Their conclusions at that time were as follows:

"From the history, it is quite apparent that this patient suffered a cerebral thrombosis with onset of symptoms while engaged in his usual work. In reviewing the history, it is noted that there was no definite accident in this case but there was described sustained effort and also described as having occurred on one of the earlier hotter days of beginning summer. The only connection, therefore, between the employment and the development of this cerebral thrombosis would appear to be the fact that such circumstances favor the alteration in the viscosity of the blood through dehydration which would favor the development of a thrombosis."

Thereafter, on September 27, 1961 the Commission made and entered its decision upon rehearing and affirmed its previous findings and award. Petitioner again protested the award and filed an application for rehearing. At the rehearing the testimony of Dr. Robert G. Beers, Dr. E. Thornton Pfeil and Dr. George G. McKhann was received. Following the rehearing the Commission, on January 18, 1962, made and entered its deci-

sion upon rehearing and affirmed its previous findings and award for noncompensable claim.

Petitioner assigns as error the finding of the Commission that petitioner "did not sustain an accident arising out of and in the course of his employment within the meaning of the Workmen's Compensation Act." There is no doubt that petitioner was engaged in the course of his employment at the time of the injury. The question is whether he was injured by an accident arising out of his employment.

In order to receive compensation an employee must show not only that he was injured in the course of his employment, but also that he was injured by accident arising out of his employment. Emery v. Industrial Commission, 69 Ariz. 87, 210 P.2d 217 (1949). An employee does not make out a case for compensation by merely showing that he suffered an unexpected internal failure while on the job or that a functional failure was coincidental with his work. Emery v. Industrial Commission, supra. To be entitled to compensation he must have been injured by accident arising out of and in the course of his employment.

In the case at bar we are not concerned with the question of whether there was an injury by accident.[1] The question

1. For an excellent discussion on the meaning of the phrase "injury by accident" see

Paulley v. Industrial Commission, 91 Ariz. 266, 371 P.2d 888 (1962).

we are confronted with is the difficult question of causation. It is necessary that there be a causal connection between the injury and the employment in order for the injury to be compensable. Phelps Dodge Corp., etc. v. Cabarga, 79 Ariz. 148, 285 P.2d 605 (1955). The question of the cause of the cerebral thrombosis suffered by petitioner is one which can be answered only by expert medical testimony. A review of the medical testimony follows.

Dr. E. Thornton Pfeil, one of the medical advisers to the Industrial Commission who had examined the petitioner, testified that with all the information that he had at hand he believed that there was a causal connection between the activity that petitioner was engaged in and the cerebral thrombosis. On cross-examination on this point he testified as follows:

"Q I believe you stated that you think there is a causal relationship between the activity in which Mr. Ware was engaged that day and the subsequent event. Are you stating that is a possibility, or do you state that in your opinion, with reasonable medical probability that such was the case?

"A It would be my feeling that there is reasonable medical probability that the situation of effort extended in the temperatures previously described had a causal relationship to his final diagnosis.

"Q Is it, medically speaking, reasonably probable there may have been some other cause, medical cause, of the cerebral thrombosis?

\* \* \* \* \* \*

"A No, sir. In view of the facts at hand, since I feel the former situation has reasonable medical probability, I do not see that any other situation has reasonable medical probability."

The Commission admits that Dr. Pfeil was of the opinion that there was the probability of a causal relationship between petitioner's employment and the cerebral thrombosis but infers that the doctor's opinion would have been different had the testimony of the petitioner concerning the amount of fluid intake on the day in question been available to him. However, in answer to the question as to whether he had an opinion as to where the blood matter came from which caused the thrombosis he testified:

"A Yes, sir. Thrombosis is attributed in formation to three mechanisms. One, alteration in the rate of blood flow. Number two, change in the viscosity or stickiness of the blood itself. Number three, alteration in the lining of the

The Commission does not contend that given a proper set of facts, together with proper medical opinion supporting it, that a cerebral thrombosis would not be a compensable injury by accident within the meaning of the Workmen's Compensation Act, A.R.S. § 23–901 et seq.

blood vessel itself. * * * Therefore, in the type of situation under discussion, I would say that the former two situations might exist, alteration in the speed of blood flow through the vessels, as might be produced in the manner that I just described by the fact that dilation of the peripheral vessels makes for a less speedy flow through the deeper vessels, and the second situation of alteration of the blood viscosity by loss of its fluid element, or water."

Thus, it appears from his testimony that his opinion was not based solely upon the factor of fluid intake.

Dr. Robert G. Beers testified as follows:

"Q [By petitioner's attorney] Well, Doctor, assuming that the facts are that Mr. Ware had been doing this type of work, which is reasonably heavy labor, mowing lawns and other related work, * * * and on the 18th of April, the temperature had risen over the preceding days, * * * from a temperature in the 80's to a temperature of approximately ninety-five degrees at the time of this incident, * * * and that at the time he was doing this, he had been exerting himself mowing lawns, what would your opinion be as to the possible relationship to this exertion as a precipitating or aggravating factor relating to the cerebral thrombosis.

"A I have been expecting your question. I have thought about it a long time and I heard the opinion that the blood could become thicker from dehydration, which is true. He could also have had narrowing in that vessel, which finally closed off. It might have been then, it might have been two weeks from then, which also would be true, so I honestly can't give you a straight answer to that, Mr. Yount, much as I would like to.

* * * * * *

"Q Can you disregard the work in which Mr. Ware was engaged and the conditions under which he was working in determining the precipitating factors in this cerebral thrombosis?

"A No, I can't.

* * * * * *

"Q * * * In view of those circumstances, then would you state that there was any causal connection between the work Mr. Ware was doing and the cerebral thrombosis?

"A I think under the circumstances, I can say I could see a relation, yes.

"Q That the cerebral thrombosis was not necessarily a mere coincidence of time, but because of the possibility of dehydration and coagulation, possibly resulting therefrom, there is a causal connection, is that correct?

"A   Yes."

On cross examination Dr. Beers was asked:

"Q   Doctor, I believe you stated * * * that in your opinion there is a possibility of a relationship between the activity in which Mr. Ware was engaged and the subsequent thrombosis. Do you have an opinion with reasonable medical probability that there is a relationship between the activity described by Mr. Ware preceding the onset of the symptoms and the cerebral thrombosis?

"A   I really don't have a very strong opinion. I think that I would have to state certainly that there could very well be a relationship.

"Q   You were stating there is a possibility?

"A   There would be a definite possibility.

"Q   Can you state that is your opinion within reasonable medical probability.

"A   There is a definite possibility that there is a relationship between the two.

"Q   Doctor, in your opinion, in a case such as Mr. Ware's, would the temperature have any bearing other than the fact that it may affect the blood viscosity?

"A   It is possible that he became exhausted and lost enough salt to ac-

tually lower the blood pressure, which would have a definite so-called heat exhaustion when the pressure dropped, whereby again it would favor thrombosis, lowered effective circulation through the brain."

The testimony upon which the Commission relies to sustain its position is that of Dr. George G. McKhann. Dr. McKhann refused to commit himself that the employment did cause the cerebral thrombosis but said it was possible and that the employment might predispose to it. Although Dr. McKhann testified that in his opinion the temperature would not make any difference he stated:

"Q   Would there be any causal connection between the working conditions, the heat exhaustion, dehydration, and the strain under which Mr. Ware was working, mowing this lawn, and cerebral thrombosis?

"A   There might be in relation to the excessive heat, sweating and dehydration, yes, I would have to answer that yes. I can't say that it would be; there might be. * * *"

In Helmericks v. Airesearch Manufacturing Co. of Arizona, 88 Ariz. 413, 357 P.2d 152 (1960) we said:

"Where * * * the only expert testimony touching the problem of causation is 'impregnated with substantial uncertainty' and '* * * as a whole

**194**

it 'is susceptible' of an interpretation that the doctor is speaking more of possibilities than probabilities,' this Court has stated it ' * * * cannot require the commission to find a fact on possibilities.' " 88 Ariz. 416, 357 P.2d 154.

■■ However, we have also said that the Commission cannot arbitrarily reject uncontroverted medical opinions which are based on matters peculiarly within the realm of scientific knowledge. Revles v. Industrial Commission, 88 Ariz. 67, 352 P.2d 759 (1960). Although the testimony of Dr. Beers and Dr. McKhann was not as positive as Dr. Pfeil's, the opinion of Dr. Pfeil that there was a causal connection, that it was a reasonable medical probability and that he failed to see that any other cause constituted a reasonable medical probability was never controverted. It therefore appears to us that the petitioner sustained his burden of proving that he was injured by accident arising out of and in the course of his employment and that there was no substantial evidence to the contrary on which to base the Commission's findings. It is well settled that this Court may set aside an award of the Commission in cases where the record contains no substantial evidence in support of the award.

Award set aside.

BERNSTEIN, C. J., UDALL, V. C. J., and STRUCKMEYER and LOCKWOOD, JJ., concur.