439 P.2d 539

**Clarence Thomas NEECE (deceased) and
Irene Neece (widow), Petitioner,**

v.

**The INDUSTRIAL COMMISSION of Arizona, and Frank Neece Fence
Company, Respondents.**

**No. 1 CA–IC 157.**

Court of Appeals of Arizona.

April 8, 1968.

---

Morgan & Schreiber, by Donald J. Morgan and David M. Schreiber, Phoenix, for petitioner.

Robert K. Park, Chief Counsel, by Noel J. R. Levy, Phoenix, for respondents.

STEVENS, Judge.

Clarence Thomas Neece during his lifetime was a carpenter and was employed by the respondent Frank Neece Fence Company, a company operated by his son. On 22 September 1965, Clarence Thomas Neece, hereafter referred to as the deceased, was 64 years of age. The respondent company was a fence building contractor, part of its work being the construction of block fences and the construction of redwood fences. On the day in question, the deceased's responsibilities were to construct a two-section ten foot gate in conjunction with the construction of a block fence. The sections of the gate were three feet and seven feet. To aid in the construction, two pieces of 2 x 4 lumber were utilized, one at the top of the gate and the other at the bottom. The final acts of workmanship were the cutting of the 2 x 4s with a hand saw followed by the cutting of the "ears" so that each portion of the gate would swing free.

On the day in question the deceased was in good spirits and in apparent good health. As was his custom, he took his lunch with him when he departed from his home for his employment. It was his custom to eat his lunch at approximately 11:30 in the morning. At approximately 1:30 in the afternoon of that day he was discovered dead. The lunch had not been eaten. The exact time of his death was not established. There is no question in the record but that on the day and at the place in question, he was engaged in the performance of his duties for his employer. Although no autopsy was performed, the cause of death was established to be a coronary occlusion. The petitioner herein is the surviving widow.

The question before us is whether he died from an "accident arising out of" his employment. Article 18, Section 8 of the Arizona Constitution, A. R. S., provides for death benefits to a widow when the death results "from any accident arising out of and in the course of, such employment". The constitutional provision was implemented by the Workmen's Compensation Act and A.R.S. § 23–1041, subsec. A provides for death benefits in substantially the same

language as that found in the constitution, namely, when the workman is "injured by accident arising out of and in the course of employment".

In 1959 the deceased was hospitalized. The file contains a report of the attending physician from which we quote as follows:

"Mr. Clarence T. Neece was first seen at Good Samaritan Hospital January 11, 1959 at the request of Frank Stump, M. D. (since deceased). Mr. Neece had a coronary occlusion with acute pulmonary edema. He made a satisfactory recovery from this and returned to work in March 1959 for half days for a month and then full time."

After the deceased returned to full work status following the 1959 hospitalization, he was fully employed, so far as his health was concerned, except for a brief period related to matters independent of any association with his heart.

Two formal hearings were held in the processing of this claim by The Industrial Commission, the first having been held on 23 November 1966 and the second on 28 April 1967.

When the deceased was found on 22 September 1965, he had completed the sawing of the 2 x 4s but the ears had not been sawed. The hand saw was free of the gate and lying on the ground. The son testified:

"Now, the only new strain that I could think of during the operation of that gate is that sometimes when you cut a double drive gate in two, through my own experience, is when you bring that saw through the last like there, you are going along pretty fast, and that saw will bind on that double drive gate and jerk your arm suddenly.

$*$ $*$ $*$ $*$ $*$ $*$

" $*$ $*$ $*$ They have a tendency when you saw the last one, to be sawing along real freely with the saw, and that last little cut in there, the gate will have a tendency to settle down and bind the saw and cause a sudden jerk of the body.

Now, that is the only thing that—"

He further testified that the deceased had performed this function in building gates many times before.

A fellow employee who was experienced in the building of gates, such as the one upon which the deceased was working, testified:

"Yes, it always does on both top and bottom 2 x 4s. It will just bind on you.

"Yes, it will just stop your saw and it will just lock it tight."

There were no witnesses who could testify from personal observation as to the facts relative to the sawing of the 2 x 4s or as to the circumstances surrounding the death.

A Cardiovascular Board was convened and the Board gave consideration to all of the testimony presented at the first hearing. The report of the Board expresses the following opinion:

"1. Deceased had definite coronary artery disease as evidenced by a myocardial infarction with pulmonary edema in 1959.

"2. It is assumed the work he was doing at the time of his death was his usual and customary work and that if indeed his death were due to coronary artery occlusion it was the natural consequence of the disease and not of his occupation or immediate activity prior to his death."

After the report had been rendered, the second formal hearing was held and a member of the Board was called as a witness, he being the only medical witness who testified in connection with the matter now under consideration. The doctor assumed that the activity of the deceased at or just prior to his death was his ordinary and usual activity and that there was no unaccustomed or unusually strenuous activity involved. The doctor was closely questioned as to a causal relationship between the assumed binding of the hand saw and the coronary occlusion which was established as the cause of death. He testified:

"THE WITNESS: Yes, statistically, medically, more myocardial infarctions

occur during sleep than during waking hours, and more occur at rest than during physical activity.

\* \* \* \* \* \*

"Now statistically, if the work was ordinary work it would be as likely to have occurred while eating his lunch or while he was asleep at night as it would at that particular moment. I don't think you can incriminate his activity immediately preceding his demise as the cause of this fatal myocardial infarction, assuming, as we must assume since the death certificate read 'myocardial infarction,' that that is what occurred."

\* \* \* \* \* \*

"Oh, I think if the process had already started and then there was some sudden extreme physical activity conceivably this could initiate a myocardial infarction."

And in response to the question,

"On the other hand, Doctor, if he wasn't an incipient case or a premyocardial infarction case all morning, and suddenly did get an infarction, wouldn't it be more reasonable to infer, if he was doing the job that required physical exertion, that the physical exertion helped to bring on this final attack rather than making it merely coincidental?"

The doctor responded,

"This would depend entirely upon the amount of physical exertion to which he was accustomed, and from all we can glean from this record, this was not unaccustomed activity."

The petitioner urges that the case of Martin v. Industrial Commission, 73 Ariz. 401, 242 P.2d 286 (1952) creates a presumption in favor of an award of compensation which presumption was not rebutted by the evidence. In Martin there was a question as to whether the deceased, at the time of the fatal automobile accident, was in the course and scope of his employment. There was no issue as to the cause of death. The presumption of his being engaged in the course and scope of his employment was resolved in favor of an award. In the case now under consideration we have a different situation in that there is no question before us as to the fact that the deceased was in the course and scope of his employment, the issue before us is as to the presence of a causal relationship between the employment and the coronary occlusion which was the cause of death.

We agree with the petitioner that it is not necessary in each death case wherein death resulted from a coronary occlusion on the job, to show that the activity of the decedent immediately before the death was unusual or was an unaccustomed physical activity. This principle is illustrated by the following cases: Phelps Dodge Corporation, Douglas Reduction Works v. Cabarga, 79 Ariz. 148, 285 P.2d 605 (1955); Gronowski v. Industrial Commission, 81 Ariz. 363, 306 P.2d 285 (1957); Revles v. Industrial Commission, 88 Ariz. 67, 352 P.2d 759 (1960); Ware v. Industrial Commission, 92 Ariz. 188, 375 P.2d 384 (1962); Thiel v. Industrial Commission, 1 Ariz.App. 445, 404 P.2d 711 (1965) and Kennecott Copper Corporation v. Industrial Commission, 4 Ariz.App. 327, 420 P.2d 194 (1966). In Davis v. Industrial Commission, 2 Ariz.App. 148, 406 P.2d 866 (1965), we pointed out that the nature of the work need not be unexpected or accidental. The matter to be resolved is whether the injury, bearing a causal relationship to that work, "itself was unusual or accidental". (Pg. 150 of 2 Ariz.App., 406 P.2d 866.)

In Gronowski at page 366 of 81 Ariz., at page 286 of 306 P.2d, the Supreme Court stated:

"Petitioner contends that the Cabarga case is identical with the case at bar and since we ruled that the commission could allow compensation in that case, we should rule that we will compel compensation in this case. Such an argument is not impressive. On the same evidence we might well permit the commission to award compensation but not necessarily compel it to do so. For us to dictate that the commission must find a fact, the evidence

must be such that there is but one possible inference to be drawn therefrom. In Jones v. Industrial Commission, supra, since the fact to be found (cause of death) was such that could be established only by medical evidence and that was definitely that the labor was a contributing cause, we ruled in effect that the commission without other evidence could not draw a contrary inference."

In Jones v. Industrial Commission, 81 Ariz. 352, at page 356, 306 P.2d 277, at page 279 (1957), the Supreme Court stated:

"It is obvious from a study of these five decisions, of which three claims were allowed, that no hard and fast rule can be laid down that governs all situations as each case must be determined upon its own peculiar facts. However, it is firmly established that for a case to be compensable, there must be a recognizable causal connection between an employee's employment and the accidental injury."

and further stated:

" * * * We submit that the question of the causal relationship between the accident and death was necessarily within the singular knowledge of medical experts; in such case their findings are conclusive upon the commission. * * * The commission is not allowed to substitute its judgment on matters lying exclusively within the field of medical science."

█ The fact that the doctor took into consideration the "usual work" of the decedent and commented that there was no showing that his work was unusual or unaccustomed, is not sufficient under the facts of this case to warrant a finding by this Court that the Award denying compensation was not reasonably sustained by the evidence. The medical evidence is clear that in the opinion of the doctor and the Cardiovascular Board, there was no causal relationship between the work performed that day by the deceased and his death.

The Award is affirmed.

CAMERON, C. J., and DONOFRIO, J., concur.