578 P.2d 159

Oris E. ALSBROOKS, Petitioner,

v.

The INDUSTRIAL COMMISSION of Arizona, Respondent,

J. F. Shea Company, Inc., Respondent Employer,

Argonaut Insurance Company, Respondent Carrier.

No. 13238–PR.

Supreme Court of Arizona, In Banc.

March 27, 1978.

Hocker & Gilcrease, Ltd., by R. Kelly Hocker, Tempe, for petitioner.

John H. Budd, Jr., Chief Counsel, Phoenix, for respondent The Industrial Commission of Ariz.

Jennings, Strouss & Salmon by Ronald H. Moore, Phoenix, for respondent employer and respondent carrier.

CAMERON, Chief Justice.

We granted the petition for review in this case to settle an apparent conflict among the previous cases of *Ronquillo v. Industrial Commission*, 107 Ariz. 542, 490 P.2d 423 (1971); *Ross v. Industrial Commission*, 112 Ariz. 253, 540 P.2d 1234 (1975); and *Smith v. Industrial Commission*, 113 Ariz. 304, 552 P.2d 1198 (1976), which concern the application of the Workmen's Compensation Act to a second injury after a prior non-industrial injury.

The question before the court is as follows: In order for a prior non-industrial injury to have the effect of changing a subsequent industrial injury from "scheduled" to "unscheduled," must the prior non-industrial injury have resulted in a disability for work? Stated differently, is a disability alone, without a showing that it affects the ability of the claimant to work, sufficient to change the subsequent injury from scheduled to unscheduled?

The facts necessary for a determination of this matter are as follows. During World War II, the claimant, Alsbrooks, sustained two non-industrial injuries. One was a shrapnel wound to the right knee and the other was a low back injury. For these injuries the claimant received a 50% service-connected permanent disability later reduced to 40%.

On 25 May 1972, claimant sustained an industrial injury to his left knee. The hearing officer found that the injury occurred in the course and scope of his employment as an electrician and entered an award for a scheduled injury. The Court of Appeals set this award aside and we granted review.

A.R.S. § 23–1041 provides that every employee covered by the Act "shall receive the compensation fixed in this chapter on the basis of such employee's average monthly wage at the time of injury." And A.R.S. § 23–1044 provides the method of determining the amount of compensation for partial disability. Paragraph B of § 23–1044 reads in part as follows:

"B. Disability shall be deemed permanent partial disability if caused by any of the following specified injuries, and compensation of fifty-five per cent of the average monthly wage of the injured employee, in addition to the compensation for temporary total disability, shall be paid for the period given in the following schedule:

\*　　\*　　\*　　\*　　\*　　\*

"21. For the partial loss of use of a finger, toe, arm, hand, foot, leg, or partial loss of sight or hearing, fifty percent of the average monthly wage during that proportion of the number of months in the foregoing schedule provided for the complete loss of use of such member, or complete loss of sight or hearing, which the partial loss of use thereof bears to the total loss of use of such member or total loss of sight or hearing."

Paragraph B provides that if a person receives an injury as enumerated, disability is presumed to result and compensation for the prescribed period of time at 55% of the average monthly wage must be paid. Thus, all the workman need show is that his injury is listed in Paragraph B and thereafter disability as well as loss of earning capacity is presumed. Because the injuries covered by Paragraph B are listed specifically, they are called "scheduled" injuries.

Paragraph C of A.R.S. § 23–1044 provides for "unscheduled" injuries, those not specifically included in Paragraph B:

"C. In cases not enumerated in subsection B of this section, where the injury

causes permanent partial *disability for work,* the employee shall receive during such disability compensation equal to fifty-five per cent of the difference between his average monthly wages before the accident and the amount which represents his reduced monthly earning capacity resulting from the disability. * * *" (emphasis added)

Under Paragraph C, if the injury is one not enumerated under Paragraph B, the injured workman has the burden of showing not only the fact that the injury arose out of and in the course and scope of his employment, but that it caused a disability for work with a resulting loss of or decrease in earning capacity. The difference between Paragraphs B and C is that loss of earning capacity for the industrial injury is presumed in Paragraph B, but must be shown under Paragraph C. As Paragraph C indicates, the injury must be an "earning capacity disability" and compensation will not be paid for disability or physical impairment without some loss of earning capacity.

Paragraph D of A.R.S. § 23–1044 requires us to take into consideration any previous disability when making an award, and we have stated in a case where the previous injury was the result of a non-industrial amputation of the distal phalanx of the left index finger:

"* * * if the prior disability arose through other than a prior industrial accident the presumption of continuing disability would not exist, and the prior disability must be shown to have affected earning capacity of the claimant at the time of the subsequent injury. *Goodyear Aircraft Corporation v. Industrial Commission,* 89 Ariz. 114, 358 P.2d 715." *Wollum v. Industrial Commission,* 100 Ariz. 317, 321, 414 P.2d 137, 140 (1966).

In order to correct what we thought was a misconception of *Wollum,* supra, we later stated:

"We hold that where there is a prior scheduled industrially related injury, the Commission may not ignore the previous injury when the workman suffers a second industrial injury. Anything in *Wollum,* supra, to the contrary is by this opinion overruled. In the case of a prior non-industrially related injury which would have been a scheduled award had it been industrially related, there is a presumption that the prior injury had an effect on the earning capacity of the workman at the time of the second injury although this presumption can be overcome as it was in *Wollum* and *Goodyear,* supra." *Ronquillo v. Industrial Commission,* 107 Ariz. at 544, 490 P.2d at 425. See also *Yanez v. Industrial Commission,* 21 Ariz.App. 367, 519 P.2d 220 (1974).

■ Following *Ronquillo,* supra, this court again recognized that there was a difference between an earning capacity disability and a disability or physical impairment having no effect upon the claimant's ability to work:

"We adopt the definitions of the terms 'permanent impairment' and 'permanent disability' found in the *Preface* to the AMA Guides:

" '(1) *Permanent Impairment.*—This is a purely medical condition. Permanent impairment is any anatomic or functional abnormality or loss after maximal medical rehabilitation has been achieved, which abnormality or loss the physician considers stable or non-progressive at the time evaluation is made. It is always a basic consideration in the evaluation of permanent disability.

" '(2) *Permanent Disability.*—This is not a purely medical condition. A patient is "permanently disabled" or "under a permanent disability" when his actual or presumed ability to engage in gainful activity is reduced or absent because of "impairment" which, in turn, may or may not be combined with other factors. . . .' " *Smith v. Industrial Commission,* supra, 113 Ariz. at 305–06, 552 P.2d at 1199–1200, fn. 1.

Determination of permanent impairment is a medical question while evaluation of a permanent disability is a law question.

Paragraph E of A.R.S. § 23–1044 reads as follows:

"E. In case there is a previous disability, as the loss of one eye, one hand, one foot or otherwise, the percentage of disability for a subsequent injury shall be determined by computing the percentage of the entire disability and deducting therefrom the percentage of the previous disability as it existed at the time of the subsequent injury."

■ Paragraph E has been interpreted to mean that if there is a previous injury, upon a second injury resulting in a disability, the second injury shall be computed in relationship to the first injury and be treated as unscheduled rather than scheduled. *Woods v. Industrial Commission*, 91 Ariz. 14, 368 P.2d 758 (1962). Thus, if there is a previous industrially related scheduled injury and a second industrial injury, the second injury must be treated as unscheduled rather than scheduled even though the second injury would normally be a scheduled injury if it had been the first injury. *Crowder v. Industrial Commission*, 81 Ariz. 396, 307 P.2d 104 (1957).

But what about a prior non-industrial injury of the scheduled type? If *Ronquillo* and *Smith*, supra, were the only cases of this court on the subject, there would be no need to consider the question further. This court has, however, in construing Paragraph E of A.R.S. § 23–1044, taken a view that appears to be in conflict with *Ronquillo* and *Smith*, supra:

"As can be seen, all the cases not enumerated in subsection B (schedule awards) must be compensated pursuant to the provisions of subsections C, D and F, with an amount which represents the employee's reduced monthly earning capacity except those cases enumerated under subsection E, quoted supra. Subsection E does not make any reference to reduced monthly earning capacity. It only requires that the percentage of disability caused by a subsequent injury be determined by computing the percentage of the entire disability and deducting therefrom the percentage of the previous disability. Hence, nothing can be found within the language of subsection E

which requires that the previous disability be one which reduced the employee's monthly earning capacity. Only a showing of a previous disability, as in the instant case the 'loss of an eye' is required * * * ." *Ross v. Industrial Commission*, supra, 112 Ariz. at 255, 540 P.2d at 1236.

■ We believe *Ross*, supra, was incorrectly decided. Paragraph C discusses "disability for work," and Paragraph E enumerates such disabilities as "the loss of one eye, one hand, one foot or otherwise," which are all scheduled disabilities and in which there is a non-rebuttable presumption that the injury is a disability for work. *Ronquillo*, supra. We do not believe that any physical impairment, the result of a prior non-industrial accident, is a "previous disability" for the purposes of Paragraph E unless there is some evidence, no matter how slight, that it is also an earning capacity disability. To hold that after a non-industrial injury, any physical impairment will convert a second scheduled injury into an unscheduled injury, would, in effect, do completely away with all scheduled injury awards since it is a rare person indeed who does not have some previous physical impairment as a result of some prior injury. However attractive it may be to wipe away the artificial and illogical differences between scheduled and unscheduled awards, that is not our prerogative but the responsibility of the legislature.

But it is contended that *Ross* follows the prior case of *McKinney v. Industrial Commission*, 78 Ariz. 264, 278 P.2d 887 (1955). In *Ross*, supra, we quoted from *McKinney* :

" 'The thought is advanced that possibly when the statute speaks of prior disability, prior industrial accident disability only is meant. We cannot agree with this. We cannot read the word "industrial" into the statute which merely mentions previous disability.' 78 Ariz. at 266, 278 P.2d at 888." *Ross*, supra, 112 Ariz. at 256, 540 P.2d at 1237.

And we stated:

"We cannot read the words 'earning capacity disability' into the statute when

only a previous physical disability is referred to." *Ross v. Industrial Commission*, supra, 112 Ariz. at 256, 540 P.2d at 1237.

In *McKinney v. Industrial Commission*, supra, the claimant had lost a leg at age 8 and suffered an industrial injury to the other leg at age 46. The Commission made a scheduled injury award and the Arizona Supreme Court properly set aside the award. The previous injury would have been scheduled had it been industrially related. The court stated:

"* * * We must of course find a purpose for each subdivision of the section. This court has held that in the event of multiple scheduled injuries occurring at the same time, our workmen's compensation law properly construed requires that such multiple injuries be removed from the schedule and be compensated by allowing for a non-scheduled disability calculated on a percentage basis. In other words, the extent of the disability is measured by the total effect upon earning power resulting from the multiple scheduled injuries. * * *" 78 Ariz. at 266, 278 P.2d at 888.

And:

"* * * It is suggested that the prior loss of petitioner's right leg did not effect his earning power and there would be no percentage of disability to deduct from his present aggregate disability. It seems extremely unrealistic to say that a man whose sphere of employment is industrial labor has no loss of earning power by the loss of a leg, especially when subdivision (e) recognizes it as causing some disability. Under all the conditions it may be great or slight but there would be something, and that something must be determined by the commission from a consideration of all influencing factors." 78 Ariz. at 266, 278 P.2d at 888.

We do not believe that McKinney supports the result in *Ross*, supra.

▄ We hold that when the statute says "disability," it means earning capacity dis-

ability even though the effect upon the workman's earning capacity may be minimal. As we earlier stated:

"The word 'disability' as used in our Compensation Act, does not mean disablement to perform the particular work petitioner was doing at the time of his injury, but refers to injuries which result in impairment of earning power generally. * * * It applies to earning power and not to inability to do a certain class of work." *Savich v. Industrial Commission*, 39 Ariz. 266, 270, 5 P.2d 779, 780 (1931).

▄ As to the instant case, the prior injuries which resulted in a 40% service-connected permanent disability are most certainly earning capacity disabilities. It is unreasonable to find that, as to a man engaged in industrial labor, a 40% permanent physical disability does not result in a disability for work.

Opinion of the Court of Appeals, 118 Ariz. 505, 578 P.2d 184 (App.1977), vacated. Award set aside.

HAYS, HOLOHAN and GORDON, JJ., concur.

STRUCKMEYER, Vice Chief Justice, concurring in part, dissenting in part:

During World War II, Alsbrooks incurred two disabilities, (1) an injury to his right knee caused by shrapnel, which limited his mobility in kneeling and climbing, and (2) a back injury. Since the Veterans Administration presently rates Alsbrooks as 50% disabled, it can hardly be doubted but that these injuries should be considered and combined with the work-related injury to Alsbrooks' left leg so as to require the application of the provisions of subdivisions C, D and E, the nonscheduled injury provisions of A.R.S. § 23–1044.

Subdivisions B, C, D and E of § 23–1044, as amended by Laws 1973, Ch. 133, § 25, are set out in full since I believe the legislative language is critical.[1]

An examination of this Court's former decisions shows that subdivisions C, D and

1. "B. Disability shall be deemed permanent partial disability if caused by any of the following specified injuries, and compensation of fifty-five per cent of the average monthly wage of

E have application to four general factual situations. First, to injuries such as to the head or back which are not enumerated in subdivision B. Second, to those cases where there has been a combination of two or more injuries in one accident, for, as this Court said in 1935 (*Ossic v. Verde Central Mines,* 46 Ariz. 176, 188, 49 P.2d 396, 401):

the injured employee, in addition to the compensation for temporary total disability, shall be paid for the period given in the following schedule:

1. For the loss of a thumb, fifteen months.
2. For the loss of a first finger, commonly called the index finger, nine months.
3. For the loss of a second finger, seven months.
4. For the loss of a third finger, five months.
5. For the loss of the fourth finger, commonly called the little finger, four months.
6. The loss of a distal or second phalange of the thumb or the distal or third phalange of the first, second, third or fourth finger, shall be considered equal to the loss of one-half of the thumb or finger, and compensation shall be one-half of the amount specified for the loss of the entire thumb or finger.
7. The loss of more than one phalange of the thumb or finger shall be considered as the loss of the entire finger or thumb, but in no event shall the amount received for more than one finger exceed the amount provided for the loss of a hand.
8. For the loss of a great toe, seven months.
9. For the loss of a toe other than the great toe, two and one-half months.
10. The loss of the first phalange of any toe shall be considered equal to the loss of one-half of the toe and compensation shall be one-half of the amount for one toe.
11. The loss of more than one phalange shall be considered as the loss of the entire toe.
12. For the loss of a major hand, fifty months, or of a minor hand, forty months.
13. For the loss of a major arm, sixty months, or of a minor arm, fifty months.
14. For the loss of a foot, forty months.
15. For the loss of a leg, fifty months.
16. For the loss of an eye by enucleation, thirty months.
17. For the permanent and complete loss of sight in one eye without enucleation, twenty-five months.
18. For permanent and complete loss of hearing in one ear, twenty months.
19. For permanent and complete loss of hearing in both ears, sixty months.
20. The permanent and complete loss of the use of a finger, toe, arm, hand, foot or leg may be deemed the same as the loss of any such member by separation.
21. For the partial loss of use of a finger, toe, arm, hand, foot, leg, or partial loss of sight or hearing, fifty per cent of the average monthly wage during that proportion of the number of months in the foregoing schedule provided for the complete loss of use of such member, or complete loss of sight or hearing, which the partial loss of use thereof bears to the total loss of use of such member or total loss of sight or hearing.
22. For permanent disfigurement about the head or face, which shall include injury to or loss of teeth, the commission may, in accordance with the provisions of § 23–1047, allow such sum for compensation thereof as it deems just, in accordance with the proof submitted, for a period not to exceed eighteen months.

C. In cases not enumerated in subsection B of this section, where the injury causes permanent partial disability for work, the employee shall receive during such disability compensation equal to fifty-five per cent of the difference between his average monthly wages before the accident and the amount which represents his reduced monthly earning capacity resulting from the disability, but the payment shall not continue after the disability ends, or the death of the injured person, and in case the partial disability begins after a period of total disability, the period of total disability shall be deducted from the total period of compensation.

D. In determining the amount which represents the reduced monthly earning capacity for the purposes of subsection C of this section, consideration shall be given, among other things, to any previous disability, the occupational history of the injured employee, the nature and extent of the physical disability, the type of work the injured employee is able to perform subsequent to the injury, any wages received for work performed subsequent to the injury and the age of the employee at the time of injury.

E. In case there is a previous disability, as the loss of one eye, one hand, one foot or otherwise, the percentage of disability for a subsequent injury shall be determined by computing the percentage of the entire disability and deducting therefrom the percentage of the previous disability as it existed at the time of the subsequent injury."

"* * * the Legislature has realized that in compensation cases two plus two does not necessarily equal four, but in some cases may equal six or more."

Third, subdivisions C, D and E have been applied where two or more injuries arising out of employment were incurred at different times, and, fourth, to cases where a

worker had previously sustained an injury which did not arise out of employment. Both of the last two instances are compensable for the same reason stated in *Ossic v. Verde Central Mines*; namely, that the last injury when combined with a previous disability for work may exceed the total work disability if the percentage of the two disabilities are simply added together.

Cases characteristic of the fourth category are *Woods v. Industrial Commission*, 91 Ariz. 14, 368 P.2d 758 (1962), where in a nonindustrial accident claimant had fallen from a tree, resulting in traumatic paraplegia necessitating amputation of both legs at his thighs, and he later incurred an industrial injury to his right hand while operating a punch press; and *McKinney v. Industrial Commission*, 78 Ariz. 264, 278 P.2d 887 (1955), where claimant suffered a nonindustrial accident resulting in the loss of his right leg and later sprained his left ankle in an industrial accident. The Court there commented:

> "We are unable to perceive how subdivision (e) can be ignored. *It makes express provision for apportioning the percentage of disability chargeable to the employer for a subsequent disabling injury.* By its terms special provision is made for this special situation. Under such conditions, subdivision (b) has no application." (Emphasis supplied.) Id. at 266, 278 P.2d at 888.

The decision by the Industrial Commission was not correct in rating Alsbrooks under subdivision B of § 23–1044 as a scheduled injury when the record, without contradiction, established prior injuries which were disabling for work. In this I agree with the majority.

But the decision goes further than simply answering the question which was raised by the parties to the appeal. It is used as a springboard by the majority of the Court to express an opinion as to legal matters wholly unnecessary to a determination of the case. I am therefore compelled to disagree with the conclusions expressed and dissent to all the dicta of the majority, particularly that overruling *Ross v. Industrial Commis-*

*sion*, 112 Ariz. 253, 540 P.2d 1234 (1975). If a governing rule of law of this jurisdiction should be changed, it should be in a case in which there is an appropriate fact situation, the issue is directly raised and counsel have been given the opportunity to brief the problem and give the Court the benefit of their views. Moreover, because the dicta involves a change in statutes by adding language which changes the meaning, it is clear that the majority have usurped the legislative prerogative to decide what the law should be.

At the onset it should be understood that the percentage of physical disability of an injured workman has no necessary parallel relationship to the percentage of loss of earnings. In *Hoffman v. Brophy*, 61 Ariz. 307, 313, 149 P.2d 160, 163, in 1944 this Court observed:

> "We certainly do not agree with the respondent employer that it is obvious that in the vast majority of cases arising under the Act that the percentage of 'functional disability' would be almost identical with the percentage of 'decreased ability to earn.' For instance, with the ordinary professional man or other 'white collared' worker a back injury causing a 15% or 25% 'functional disability' might not decrease his earning capacity at all; whereas, with a common laborer such a back injury might be nothing short of an economic disaster. *There is no necessary parallel relationship between the percentage of general functional physical disability and the percentage of loss of earnings.*" (Emphasis supplied.)

Obviously, also there is no necessary relationship between percentage of physical disability and loss of earning capacity.

In A.R.S. § 23–1044, subdivisions C, D and E, quoted supra, note 1, the word "disability" means "disability for work." This clearly has been the meaning ascribed by the Legislature since the promulgation of the Workmen's Compensation Act. It does not mean "physical impairment" or "earning capacity disability", terms frequently used by the majority in their opinion.

In 1925, by Chapter 83 of the Laws of 1925, the Legislature enacted a Workmen's Compensation Act. Subdivision B of § 70 pertained to total disabilities. Subdivision C[2] pertained to partial disabilities. In C, 2, (a) through (v) the Legislature specified how certain enumerated injuries would be compensated; (w) and (x) contain the legislative directions on how all other injuries not specified would be compensated. These latter injuries have been variously described over the years as "nonscheduled" or "odd lot."

A simple reading of paragraph (w) settles beyond the possibility of a doubt that from the beginning the compensation allowed was for injuries causing "disability for work." The Legislature said that if there was an unscheduled injury in which there was a "disability for work" an employee received 55% of the difference between his monthly wage before the accident and the monthly wage he was able to earn thereafter. So, conversely, if a workman was injured and incurred a disability but not a disability for work, he received nothing. Workmen's Compensation is not awarded for being hurt, but as the Legislature directed for disability for work or, as the cases have often said, interchangeably, for loss of earning capacity.

In the second paragraph of (w), since there is no reason to believe the Legislature intended to shift the meaning of the word "disability" to something other than "disability for work," it must be accepted that the word was used in the same context as in the preceding paragraph. The second paragraph of (w) must therefore be read as:

> In determining the percentage of disability *for work,* consideration shall be given, among other things, to any previous disability *for work.*

Likewise, paragraph (x) must mean:

> Where there is a previous disability *for work,* as a loss of one eye, one hand, one foot, or any other previous disability *for work,* the percentage of disability *for work* for a subsequent injury shall be, etc.

If the Legislature intended to change the meaning of "disability" to "earning capacity disability" or "physical impairment", it undoubtedly would have said so in order to avoid the obvious possibility of confusion.

That it was not an earning capacity disability is made absolutely clear three years later in the Revised Code of 1928, § 1438.[3]

---

**2.**  LAWS 1925, CH. 83, § 70
"(C) PARTIAL DISABILITY
1. Temporary partial disability: For temporary partial disability, sixty-five (65) per cent. of the difference between the wages earned before the injury and the wages which the injured person is able to earn thereafter, for a period not to exceed sixty (60) months during the period of said disability.
2. In case of any of the following specified injuries, the disability caused thereby shall be deemed a permanent partial disability, and compensation of fifty-five (55) per cent. of the average monthly wage shall be paid in addition to the compensation paid for temporary total disability for the period named in the following schedule:
(a) * * *
    *    *    *    *    *    *
(w) Where the injury causes partial disability for work, the employee shall receive, during such disability, compensation equal to fifty-five (55) per cent. of the difference between his average monthly wages before the accident and the monthly wages he is able to earn thereafter. In no case shall the payments continue after the disability ends, or death of the injured person and in case the partial disability begins after a period of total disability the period of total disability shall be deducted from such total period of compensation.
In determining the percentage of disability, consideration shall be given, among other things, to any previous disability, the occupation of the injured employee, the nature of the physical injury, and the age of the employee at the time of the injury.
(x) Where there is a previous disability, as the loss of one eye, one hand, one foot, or any other previous disability, the percentage of disability for a subsequent injury shall be determined by computing the percentage of the entire disability and deducting therefrom the percentage of the previous disability as it existed at the time of the subsequent injury."

**3.**  The second paragraph in (w) was consolidated with (x) in this fashion:
"(w) where the injury causes partial disability for work, the employee shall receive, during such disability, compensation equal to fifty-five per cent of the difference between his average monthly wages before the accident and the monthly wages he is able to

Paragraph (w), after 1928, can only be understood to mean that where the injury causes disability for work, in determining the percentage of disability for work, consideration shall be given to any previous disability for work and that this must be deducted from the workman's entire disability for work in order to arrive at his compensation. An injured workman who had a previous disability *for work* was not to be paid what a perfect workman could have earned.

In 1939, the Legislature amended the compensation act. Laws 1939, Ch. 28, § 11. No significant changes were made in the previously quoted language except that the paragraphs were renumbered. Then in 1953, the Legislature deleted this language:[4]

"* * * the difference between his average monthly wages before the accident and the monthly wages he is able to earn thereafter * * *."

and this language was added in its place:

"* * * the difference between his average monthly wages before the accident and the amount which represents his re-duced monthly earning capacity resulting from such disability * * *."

and in the next subdivision, this language:

"In determining the percentage of disability * * *."

was changed to:

"In determining the amount which represents the reduced monthly earning capacity for the purposes of subsection (c) * * *."

The difference between an "earning capacity disability" and a "disability for work" can be readily illustrated. A judge could suffer the loss of one eye while working and have a disability for work but no earning capacity disability. He would be compensated under A.R.S. § 23–1044(B)(16) or (17). If the judge lost his second eye while working, becoming totally blind, he might be wholly, 100% incapacitated, disabled for work. He would therefore be compensated under A.R.S. § 23–1044(C), (D) and (E) by deducting the percentage of disability for work occasioned by the first injury from the total disability. (He had already been compensated for the first loss.) In Alsbrooks' case, the percentage of disability for work caused by his injuries in

---

earn thereafter, but the payments shall not continue after the disability ends, or death of the injured person, and in case the partial disability begins after a period of total disability the period of total disability shall be deducted from such total period of compensation.

In determining the percentage of disability, consideration shall be given, among other things, to any previous disability, the occupation of the injured employee, the nature of the physical injury, and the age of the employee at the time of the injury. Where there is a previous disability, as the loss of one eye, one hand, one foot, or any other previous disability, the percentage of disability for a subsequent injury shall be determined by computing the percentage of the entire disability and deducting therefrom the percentage of the previous disability as it existed at the time of the subsequent injury."

4.      LAWS 1953, CH. 55, § 1

"(c) In cases, not enumerated in subsection (b), where the injury causes permanent partial disability for work the employee shall receive, during such disability, compensation equal to fifty-five (55) per cent of the difference between his average monthly wages before the accident and the amount which represents his reduced monthly earning capacity resulting from such disability, but the payment shall not continue after the disability ends, or the death of the injured person, and in case the partial disability begins after a period of total disability, the period of total disability shall be deducted from such total period of compensation.

(d) In determining the amount which represents the reduced monthly earning capacity for the purposes of subsection (c), consideration shall be given, among other things, to any previous disability, the occupational history of the injured employee, the nature and extent of the physical disability, the type of work the injured employee is able to perform subsequent to the injury, any wages received for work performed subsequent to the injury, and the age of the employee at the time of injury.

(e) In case there is a previous disability, as the loss of one eye, one hand, one foot, or otherwise, the percentage of disability for a subsequent injury shall be determined by computing the percentage of the entire disability and deducting therefrom the percentage of the previous disability as it existed at the time of the subsequent injury."

World War II must be deducted from the total of his disability for work as it existed after the accident of May 25, 1972. It is not the loss of earning capacity which Alsbrooks suffered because of his war injuries, it is his disability for work deducted as a percentage from the total of his disability for work. Alsbrooks as a union employee may not have had an actual earning capacity loss. *He had, however, most certainly previously suffered some disability for work.* Subsection D of § 23–1044 requires that the previous disability for work must be taken into consideration in "determining the amount which represents the reduced monthly earning capacity for the purposes of subsection C." Whether Alsbrooks had a reduction in earning capacity is not established by the evidence.

By statute, as written by the Legislature, Alsbrooks does not have to show that he had a disability which caused an earning capacity loss, only that he had a previous disability for work. He then must be rated under subdivisions C, D and E. By the language of the statute there need only be shown the extent that Alsbrooks' present injury, when combined with his previous disability for work, reduced his monthly earning capacity. He must then be compensated by the statutory formula of deducting the percentage of previous disability for work from the percentage of total disability for work.

For the foregoing reasons, I cannot agree with the majority that "when the statute says 'disability' it means earning capacity disability * * *." I will withhold further comment until an actual controversy arises over which, under the Constitution, this Court has jurisdiction.