926 P.2d 533

Jesus VARGAS, Petitioner,

v.

The INDUSTRIAL COMMISSION OF ARIZONA, Respondent,

Restaura, Respondent Employer,

Helmsman Management Services, Respondent Carrier.

No. 1 CA–IC 96–0007.

Court of Appeals of Arizona, Division 1, Department C.

Nov. 5, 1996.

Ruben J. Marchosky, Phoenix, for Petitioner.

Anita R. Valainis, Chief Counsel, Industrial Commission of Arizona, Phoenix, for Respondent.

Doherty & Venezia by Julie A. Doherty, Phoenix, for Respondent Employer and Respondent Carrier.

## OPINION

KLEINSCHMIDT, Judge.

Jesus Vargas injured his knee at work. He appeals an award for a scheduled ten percent permanent partial disability. Vargas contends that his injury should be unscheduled and that the evidence compels a finding of a greater disability than the administrative law judge awarded. We conclude that the injury is a scheduled one, and that Vargas has failed to meet his burden of proving that the administrative law judge incorrectly determined the impairment percentage attributable to the industrial injury. We affirm.

Vargas originally injured his right knee in 1979 while playing football, and he underwent two knee surgeries for that injury. At that time, Vargas was a cook for Village Inn Restaurants. He returned to this job after the surgeries, but was discharged when a new company bought the restaurant. Vargas continued to cook for several different restaurants until he took a job with the Respondent, Restaura, in 1991, also as a cook. On his Restaura job application, Vargas indicated that he had no physical problems that would limit his work ability. Vargas' two supervisors at Restaura both stated that Vargas was a good employee who performed all his duties. Neither had heard him complain of physical problems, and neither had seen anything in his performance that indicated limited physical ability. Following the surgeries he received no further treatment for his knee.

In March 1993, Vargas fell and injured his right knee while at work. He was treated by Culley K. Christensen, M.D. Dr. Christensen determined that Vargas "had significant degenerative arthritis, joint space narrowing, loose bodies and bone spur formation" that predated the industrial accident. After performing surgery, Dr. Christensen formed an

opinion that "some tearing of the peripheral remaining rim of the meninscus [sic]" was the result of the fall at work.

The carrier issued a notice of claim status in March 1993, accepting the claim for benefits. Dr. Christensen continued to treat Vargas and concluded that the knee was stationary in March 1994. In September 1994, the carrier issued a notice of claim status terminating active medical care and temporary compensation, as well as a notice of permanent disability indicating that Vargas had sustained a twenty percent disability of the right knee.

In December 1994, Vargas filed a request for hearing to protest the carrier's notices. At the hearing, Dr. Christensen testified that, according to the American Medical Association guidelines, Vargas had a twenty-five to twenty-nine percent permanent impairment to his right knee before the March 1993 industrial injury. Later, during the hearing, he stated that pre-industrial impairment was possibly as high as fifty percent.

Dr. Christensen also testified that the American Medical Association had "rather clear" impairment guidelines for a "partial meniscectomy," and said that there was a ten percent impairment of the knee attributable to the industrial injury. When asked by Petitioner's counsel if the preexisting injuries acted in combination with the industrial injury to impair the knee, Dr. Christensen stated, "I don't know what you mean by combination. Every structure, every abnormal feature about the knee is a contributing factor to .an overall impairment, yes." Dr. Christensen also agreed with Petitioner's counsel that "as much as fifty percent impairment" resulted from "a progressive set of events where you have events that aggravate and continuously aggravate the condition of the knee to the point where [Vargas] ends up with a severe impairment[.]" Dr. Christensen went on to say that the total impairment was due to many things, including everyday walking. Petitioner's counsel summarized Dr. Christensen's response by saying, "At the point in time when you last saw [Vargas] in 1994 and he has as much as a 50 percent permanent impairment, it's as a result of a combination of factors including the industri-

al injury of 3–1–94." Dr. Christensen agreed with this statement.

The administrative law judge issued an award finding the knee stationary in March 1994 and that Vargas had a ten percent scheduled permanent partial disability of his right knee. Vargas filed a request for review, but the administrative law judge affirmed the findings and award.

## THE INJURY IS A SCHEDULED INJURY

■ Vargas first argues that his condition should not have been classified as a scheduled disability. Although an injury to the knee is usually a scheduled disability, *see Peret v. Industrial Comm'n*, 13 Ariz.App. 115, 474 P.2d 474 (1970), Vargas says the existence of a prior impairment renders it unscheduled.

A review of the basic principles that govern the issues is helpful. A scheduled disability is one, such as the loss of a leg, that is listed in Arizona Revised Statutes Annotated ("A.R.S.") section 23–1044(B). Such scheduled disabilities are deemed to result in a permanent partial disability which is generally compensated at fifty-five percent of the worker's average monthly wage for a prescribed number of months. A.R.S. § 23–1044(B)(1995). The number of months prescribed varies with the severity of the disability. The loss of a leg, for example, is compensated for fifty months. A.R.S. § 23–1044(B)(15). The partial loss of the use of a scheduled body part is compensated at a reduced amount measured as a percentage of the amount allowed for the total loss of that part. A.R.S. § 23–1044(B)(21). A worker with a scheduled disability is entitled to compensation even if the impairment has not caused a loss of earning capacity. Indeed, actual lost earning capacity is not considered in determining a scheduled award. A.R.S. § 23–1044(H).

Unscheduled disabilities are those which are not listed in section 23–1044(B). *See* A.R.S. § 23–1044(C). For example, a back injury is an unscheduled disability. An unscheduled industrial injury which causes permanent loss of earning capacity is generally

compensated at fifty-five percent of the difference between the worker's average monthly wage before the accident and his reduced monthly wage resulting from the disability attributable to the accident. *Id.* Compensation for an unscheduled disability is paid for as long as the disability continues. *Id.* Because even disabilities initially believed to be permanent may resolve favorably, compensation ceases if and when the disability ends. A.R.S. § 23–1044(C), (F). Thus, loss of earning capacity is always a key factor in determining the amount of compensation for a disability resulting from an unscheduled injury.

■ There are other principles of workers' compensation law that bear on Vargas' claim that the existence of a prior impairment renders his industrial injury an unscheduled disability. If a worker had a preexisting impairment that caused a loss of earning capacity, a subsequent scheduled disability will be treated as an unscheduled disability. *Alsbrooks v. Industrial Comm'n,* ˙118 Ariz. 480, 578 P.2d 159 (1978). For purposes of converting a subsequent scheduled disability into an unscheduled disability, a severe nonindustrial impairment creates a conclusive presumption that the nonindustrial impairment caused a loss of earning capacity. *Pullins v. Industrial Comm'n,* 132 Ariz. 292, 645 P.2d 807 (1982). Cases which have applied the conclusive presumption have involved severe preexisting impairments such as the loss of a limb. *See Woods v. Industrial Comm'n,* 91 Ariz. 14, 368 P.2d 758 (1962) (prior loss of both legs); *Edwards v. Industrial Comm'n,* 3 Ariz.App. 290, 413 P.2d 800 (1966) (previous loss of arm).

■ While a knee injury can certainly be serious, in our opinion Vargas' nonindustrial impairment was not of such magnitude as to create a conclusive presumption that it caused a loss of earning capacity. In the absence of such a conclusive presumption, a preexisting nonindustrial scheduled disability creates a rebuttable presumption that the nonindustrial impairment "resulted in an earning capacity disability." *Pullins,* 132 Ariz. at 294, 645 P.2d at 809. This presumption is rebuttable because not every nonindustrial impairment results in a loss of earn-

ing capacity. *Alsbrooks,* 118 Ariz. at 483, 578 P.2d at 162.

The facts of this case reasonably support the administrative law judge's finding that the prior nonindustrial impairment did not affect Vargas' earning capacity. *See Nelson v. Industrial Comm'n,* 24 Ariz.App. 94, 536 P.2d 215 (1975) (commission's findings and award will be sustained if they are reasonably supported by the evidence). At the time of the nonindustrial injury, Vargas was a cook. He returned to this job after two surgeries and held several jobs without complaining about his knee or receiving further treatment for it. In his job application for Restaura, Vargas indicated that he had no physical problems which would limit his job ability, and two of his supervisors at Restaura testified that Vargas had never complained of physical impairment and that they had never observed any.

## VARGAS FAILED TO ESTABLISH THAT THE ADMINISTRATIVE LAW JUDGE ERRED IN CALCULATING THE PERCENTAGE OF IMPAIRMENT

■ We have already observed that the amount of an award for a scheduled disability is governed by A.R.S. section 23–1044(B). When there is a partial loss of use to a scheduled body part, the award is based on expert medical testimony which quantifies the degree of impairment caused by the injury. Typically, the expert medical testimony tracks the *Guides to the Evaluation of Permanent Impairment* published by the American Medical Association. *See* Ariz. Admin. Code R20–5–113 (1995). The guides are not to be applied rigidly, however, and should be followed only when they truly reflect a claimant's loss. *W.A. Krueger Co. v. Industrial Comm'n,* 150 Ariz. 66, 722 P.2d 234 (1986). We acknowledge that the *Krueger* line of cases did not address multiple impairments to a scheduled body part. However, these cases support the general principle that the guides are a tool for reaching an accurate assessment of a claimant's impairment caused by an industrial injury, and while the rating based on the guides may be accurate for each isolated impairment, it is the overall

impairment caused by the industrial injury that is important.

■ In those instances where an industrial accident injures a scheduled body part that was already impaired, the usual means of calculating the award is simply to determine the amount of the impairment attributable to the subsequent industrial injury. *See Goodyear Aircraft Corp. v. Industrial Comm'n*, 89 Ariz. 114, 358 P.2d 715 (1961), *overruled on other grounds by Ross v. Industrial Comm'n*, 112 Ariz. 253, 540 P.2d 1234 (1975). Sometimes, however, when there is a prior existing condition, the impairment rating attributed to the subsequent industrial injury in isolation may not accurately reflect the claimant's loss. How is the award determined when the total impairment may exceed the sum of the impairment which resulted from the prior existing condition and the impairment which resulted from the scheduled industrial injury?

Vargas contends that the employer should be liable for the total present impairment. He relies on the principle that an employer takes his worker as he finds him. *Murray v. Industrial Comm'n*, 87 Ariz. 190, 349 P.2d 627 (1960). However, this principle has been applied in the context of unscheduled disabilities where an industrial injury aggravated a preexisting impairment or latent defect to cause a loss of earning capacity disability. *See Morrison–Knudsen Co., Inc. v. Industrial Comm'n*, 115 Ariz. 492, 566 P.2d 293 (1977). This is not what happened in this case and therefore the principle should not apply. Rather, we believe an approach like that explained in *Hoppin v. Industrial Comm'n*, 143 Ariz. 118, 692 P.2d 297 (App. 1984), should govern this case.

In *Hoppin*, which involved an unscheduled injury, we interpreted A.R.S. section 23–1044(E), and held that if a worker had a prior existing condition which was not disabling and then received an industrial condition which resulted in a loss of earning capacity, the employer takes the worker as he finds him and the entire disability is compensable. 143 Ariz. at 124, 692 P.2d at 303. But, as we explained, when a worker has a preexisting injury, industrial or nonindustrial, that *has already caused a loss of earning capacity,*

and then suffers an industrial injury that increases the total loss of earning capacity, only the loss caused by the industrial injury is compensable. 143 Ariz. at 121, 692 P.2d at 300. In this latter situation, *Hoppin* explained that the administrative law judge should first compute "the entire present loss of earning capacity, and then deduct therefrom the percentage of the previous loss of earning capacity as it existed at the time of the industrial injury." 143 Ariz. at 123, 692 P.2d at 302. Only the remaining percentage of loss of earning capacity is attributable to the industrial injury. *Id.*

We see no reason why the rule of *Hoppin* ought not apply to apportioning impairment percentages in scheduled awards when an industrial injury further impairs a scheduled body part that has preexisting impairment. While *Hoppin* based its analysis on section 23–1044(E), it is consistent with general workers' compensation principles that an employer will be liable only for disability or impairment caused by the industrial injury. *See Circle K Store #1131 v. Industrial Comm'n*, 165 Ariz. 91, 796 P.2d 893 (1990); *Ware v. Industrial Comm'n*, 92 Ariz. 188, 375 P.2d 384 (1962); *McCreary v. Industrial Comm'n*, 172 Ariz. 137, 835 P.2d 469 (App. 1992).

Following this approach, a claimant's total post-industrial injury impairment should be determined first. The preexisting nonindustrial impairment should then be determined and deducted. The remaining impairment, measured as a percentage of the whole impairment, is attributable to the industrial injury and should be the basis for the award. Vargas, however, has not shown that the administrative law judge did not follow this approach, or assuming the judge did not, that the outcome would be different if the right method had been applied. Dr. Christensen was able to assign impairment percentages to both the preexisting and the industrial injuries, twenty-nine and ten percent respectively. Yet, there was some indication that the knee was impaired by as much as fifty percent before the industrial injury. There is some indication that the additional impairment may have been due to degenerative arthritis but the evidence on this point was

confusing and inconclusive. The burden was on Vargas to clarify the point, and this he failed to do. We cannot say that the ten percent impairment that the administrative law judge attributed to the industrial accident was an inaccurate assessment of the impairment caused by the industrial injury.

Vargas' final argument is that the award should be vacated because Dr. Christensen's testimony at the hearing contradicted his prior medical report, in which he stated that the knee had a twenty percent impairment, ten percent due to loss of meniscus and ten percent due to anterior cruciate ligament tear. The report does not specify which accident caused the separate impairments. At the hearing, Dr. Christensen explained that the anterior cruciate ligament tear pre-dated the industrial injury. The testimony at the hearing did not impeach or contradict the March 1994 report. Rather, the testimony clarified the information contained in the report.

The award is affirmed.

THOMPSON, P.J., and McGREGOR, J., concur.