488 P.2d 495

**Hubert C. STOTTS, Petitioner,**

v.

**The INDUSTRIAL COMMISSION of Arizona, Respondent,**

**Washington School District No. 6, Respondent Employer,**

**State Compensation Fund, Respondent Carrier.**

**No. 1 CA–IC 440.**

Court of Appeals of Arizona, Division 1, Department B.

Sept. 7, 1971.

Rehearing Denied Oct. 6, 1971.

Review Granted Nov. 16, 1971.

Harrison, Myers & Singer, Gorey & Ely, by Herbert L. Ely, Phoenix, for petitioner.

William C. Wahl, Jr., Chief Counsel, The Industrial Commission of Arizona, Phoenix, Robert K. Park, Chief Counsel State Compensation Fund, by Courtney L. Varner, Phoenix, for respondents.

JACOBSON, Presiding Judge.

This heart attack case requires a determination as to whether the factual basis for the hypothetical question propounded to a medical expert who established medical causation was supportable by the evidence.

Petitioner, Herbert C. Stotts, at the time of his heart attack was a 50 year old man who had been employed by the Washington School District No. 6 at Sahuaro Elementary School as a custodian. He had been so employed for at least five years. His duties as custodian consisted of daily sweeping and dusting three classrooms, sweeping and mopping the kitchen and cafeteria area, sweeping the teachers' lounge, sweeping and mopping the mess room, sweeping and cleaning the physical education room, the boys' rest room and the girls' rest room, sweeping and policing the areas in front of the school including

walks and watering the grounds. The petitioner also daily helped in loading the garbage cans weighing between 10 and 100 pounds onto a garbage truck. Also, on occasion, when the cafeteria area was needed for activities other than lunch, petitioner was required to take down and stack 36 tables and 240 chairs. The tables weighed between 70 and 75 pounds each and the chairs weighed approximately 15 pounds each. After the special activity was completed in the cafeteria, petitioner was likewise required to replace the tables and chairs in their normal position. This tearing down of the cafeteria and setting back up was done by two individuals, and was performed approximately 44 times from the start of the school year until December 12, 1968, when petitioner suffered his myocardial infarction. Approximately 15 percent of the 44 times the cafeteria was rearranged, petitioner was not present to engage in this activity. While petitioner had no history of heart trouble, later investigation revealed he suffered from arterial sclerosis.

On December 12, 1968, petitioner arrived for work feeling well. He cleaned the rest rooms, swept and performed his normal routine work. At approximately 9 a. m. he began setting up the cafeteria with the help of another custodian. The chairs and tables in the cafeteria had been removed and stacked the previous day for a social event. While engaged in this activity he complained of pain in his chest and arm. Following the setting up of the cafeteria, he took a short break and then proceeded to lift garbage cans for the garbage truck and started on his normal activities of sweeping the walk in front of the school. While so engaged, his pain became more intense, he began to perspire and his color became ashen. He was taken to a doctor and subsequently to a hospital where his condition was diagnosed as an acute myocardial infarction. Based upon this episode petitioner filed his claim for workmen's compensation. The Commission found his heart attack to be non-work-related.

The only medical expert to testify at the hearing in this matter was Dr. Monroe H. Green, who had never examined the petitioner nor studied his medical records, his opinion as to the causal relationship between petitioner's heart attack and his work being based solely upon a hypothetical question and his own personal expertise.

This hypothetical question, which is the crux of the particular matter to be disposed of by this appeal, points up the confusion which has befogged the subject of whether the workman's activity which gives rise to a heart attack was a "usual" activity or an "unusual" activity in relation to his normal work. This confusion surrounding the "usual v. unusual" dichotomy stems from a failure to differentiate on the one hand an "accident"[1] which would give rise to a compensable injury under workmen's compensation laws, and on the other hand the "causal" connection between the work activity of the workman and his ensuing heart attack. As to the former, Arizona has joined the majority of states in holding that in order for an injury to be "accidental" and therefore compensable it need not arise out of activity on the part of the workman which is "unusual" in relation to his normal activities. Phelps Dodge Corporation, Douglas Reduction Works v. Cabarga, 79 Ariz. 148, 285 P.2d 605 (1955); Phelps Dodge Corporation v. DeWitt, 63 Ariz. 379, 162 P.2d 605 (1945); see 1A A. Larson, The Law of Workmen's Compensa-

---

1. Article 18, § 8 of the Arizona Constitution, A.R.S., provides in part:
    "The Legislature shall enact a Workmen's Compensation Law applicable to workmen * * * by which compensation shall be required to be paid to any such workman * * *, if in the course of such employment personal injury to or death of any such workman *from any accident* arising out of and in the course of, such employment, is caused * * * by a necessary risk or danger of such employment * * *." (Emphasis supplied.)

tion § 38.20 (1971). The above-quoted cases overruled previous Arizona decisions which held that an "accident", in order to be compensable, must arise out of a *sudden or unexpected event. See* Pierce v. Phelps Dodge Corp., 42 Ariz. 436, 26 P. 2d 1017 (1933).

However, having held that an injury may be "accidental" although occurring during a usual activity, the necessity of showing the causal connection between the activity (work) and the injury remains. As was stated in Phelps Dodge Corporation, Douglas Reduction Works v. Cabarga, *supra*:

> "Of course the usual or unusual exertion must be of such quality or character and substance as to convince the fact-finding body that the injury can be traced thereto with such reasonable assurance that it can be said that the work or energy put forth caused or contributed to the injury. *There must be a recognizable causal connection*." (Emphasis added.) 799 Ariz. at 153, 285 P.2d at 608.

It is in this causal connection requirement that the "usual v. unusual" dichotomy is still viable. This is for the simple reason that some members of the medical profession require as a fact that the activity of the workman which gives rise to the heart attack be "unusual" or "not normal" as compared to his normal work activities in order to establish the causal connection between that activity and the heart attack. Dr. Green's testimony in this case is illustrative of this school of medical theory:

> "[Dr. Green]: I think that the frequency of setting up the tables, with or without help, was more than is usual and customary effort and that with this *unusual (in terms of frequency)* effort that he very likely had his myocardial infarction precipitated by this effort * * *.
>
> "Q: The fact is in your opinion, Doctor, whatever the underlying disease process, the infarction was precipitated

by this *unusual* exertion on the day in question?

> "A: Yes.
>
> "Q: Are there any other reasons which you care to give for your opinion, Doctor?
>
> "A: *I think this is the crux of the entire causal relationship*." (Emphasis added.)

The waters of medical causation in heart attack cases are further muddied by the disagreement in the medical profession itself as to the cause of heart attacks. Again Dr. Green's testimony is illustrative:

> "Mr. Varner: When do most myocardial infarctions occur? Do they occur under conditions of stress—not stress, but strenuous activity cr do most of them occur at rest?
>
> "The witness: This is very moot. The exponent or advocate of the idea that they occur more frequently at rest than during waking hours, more frequently at night during sleep than activity, is Dr. Arthur Master of New York. On the other hand, we all see the documented cases of a myocardial infarction occurring in the winter when somebody is shoveling snow to clear his driveway, pushing a stalled car in the snow, occurring during the heat of an argument—when blood pressure goes way up.
>
> "Mr. Varner: Have there been any scientific studies made on the myocardial infarction to determine whether or not how and when they occur?
>
> "The Witness: They are purely statistical results and these depend upon the group of cases one is studying. I am sure, for example, that when you study myocardial infarctions that are related to employment—to an individual's occupation, you will find a great number of them during the day during waking hours than occur at rest. On the other hand, if you study the incidence in the general population, you have got an entirely different group; and at least in Arthur Master's theories, more of them

occur at night than during the waking hours."

The courts are thus faced with a dilemma! They bind themselves to follow medical opinion as to causation in heart attack cases (Pima Mining Company v. Industrial Commission, 11 Ariz.App. 480, 466 P.2d 31 (1970)) but this same judicially relied upon medical opinion may vary from doctor to doctor when discussing the same set of facts depending upon the school of medical causation the particular doctor follows. This in turn leads to the enumerable "conflict in the medical testimony" cases in which the Industrial Commission is allowed to choose the particular medical testimony on which it wishes to place reliance. Baum v. Industrial Commission, 98 Ariz. 396, 405 P.2d 880 (1965). The result has been a hodge-podge of decisions where compensation has been granted under one set of facts and denied under similar facts. (Compare the conflicting results reached between the first and second hearing by the Commission in the case of Pima Mining Company v. Industrial Commission, *supra*.) These conflicting medical schools of thought also result, when the claimant's medical expert belongs to the unusual activity school, in attempting to base the "unusualness" of the work activity solely on the frequency of occurrence of the activity which was being engaged in at the time the first symptoms of the heart attack appeared.

Thus, in the case before us, based upon a hypothetical question which embraced as a fact that petitioner was engaged in breaking down and setting up tables in the cafeteria only on 29% of his working days, the doctor considered this work unusual in terms of frequency and first testified that there was a causal connection between this unusual work-related activity and the petitioner's heart attack. However, the doctor qualified this opinion by stating that if petitioner had engaged in this activity 40 percent of the time he would not consider the activity unusual and therefore in his opinion no causal relationship would exist. He was further of the opinion that if petitioner was engaged in lifting heavy garbage cans each day, coupled with the expenditure of energy necessary for the cafeteria work, this would not be an unusual activity for the petitioner and in the doctor's opinion there would be no causal connection. As a matter of fact, petitioner did engage in lifting heavy garbage cans each day, so the Commission's finding that petitioner's heart attack was not work-related is supportable by the evidence.

While under the evidence of this case we must affirm the decision of the Industrial Commission, we cannot help but wonder whether the industrial heart attack area is not a proper subject for definitive legislation, so as to bring some order out of the chaos which has resulted from the present statutes and decisions in this crucial area of our workmen's compensation laws.

Award affirmed.

HAIRE and EUBANK, JJ., concur.