619 P.2d 27

Leona M. ARCHER, Widow, Donald R. Archer, Deceased, Petitioner,

v.

The INDUSTRIAL COMMISSION of Arizona, Respondent,

ASARCO, Inc., Respondent Employer,

State Compensation Fund, Respondent Carrier.

No. 1 CA–IC 2287.

Court of Appeals of Arizona, Division 1, Department C.

Aug. 26, 1980.

Rehearing Denied Oct. 7, 1980.

Review Denied Nov. 4, 1980.

experienced on the job by all of his co—workers . . . .

122 Ariz. at 243, 594 P.2d 109.

Rabinovitz & Dix, P. C. by Charles G. Rehling, Bernard I. Rabinovitz, Tucson, for petitioner.

Calvin Harris, Chief Counsel, The Industrial Commission of Arizona, Phoenix, for respondent.

Twitty, Sievwright & Mills by John F. Mills, Phoenix, for respondents employer and carrier.

## OPINION

JACOBSON, Judge.

What is the status of the law in Arizona in Workmen's Compensation cases where the resulting injury is caused by emotional stress? This is the issue presented in this second review of an award of the Industrial Commission denying benefits to the widow of a workman who died as a result of a heart attack.

The workman, Donald R. Archer, died as a result of a heart attack on March 22, 1977, the manifestations of the symptoms occurring at work. The first award in this matter, which found compensability, was set aside in *ASARCO, Inc. v. Industrial Commission*, 122 Ariz. 241, 594 P.2d 107 (App. 1979) (review denied May 1, 1979) on the following ground:

The hearing officer in the case before us did not make a specific finding regarding whether the gradual work—related stress experienced by the deceased during his employment with petitioner ASARCO was "unexpected, unusual, or extraordinary" as compared to the everyday stress

Following this court's set aside, a further hearing was held before the Commission at which no new medical evidence was presented, but lay witnesses testified concerning the events surrounding the deceased's death. The hearing officer subsequently entered an award denying compensability and in doing so, made two key findings:

[1] The evidence does not establish a significant relationship between the physical exertion and the myocardial infarction. [2] Although the preponderance of the evidence does establish that the deceased's myocardial infarction was in part caused by and due to the emotional stress experienced on this job, it fails to establish that the everyday stress experienced by the deceased was any greater than that sustained by his co—workers.

Following a request for administrative review and its denial, a timely review of the Commission's award was sought in this court.

The facts are that on March 22, 1977, the deceased suffered a fatal myocardial infarction while employed as a shovel repairman by respondent ASARCO, Inc. Prior to the summer of 1976, the deceased apparently was an outwardly healthy, easygoing individual. During that summer he began to complain of pain in his arms and shoulders, and underwent somewhat of a personality change, which continued until his death.

These changes consisted of the deceased becoming more withdrawn, complaining about fellow workers, especially Mexican—Americans, and becoming easily angered over job incidents. He was described by a psychiatrist as being a "perfectionist, compulsive, impatient man" who "didn't allow [himself] much room to blow off any steam or relieve any pressures, so, in a sense he tended to keep things inside."

Several months before his death, the deceased complained to the leadman (foreman) of his crew that his shoulders were aching and requested permission to see a

doctor. At that time, the doctor diagnosed hypertension and prescribed a diuretic and muscle relaxant. He was subsequently transferred to "lube" truck duties which were somewhat less strenuous than duties on the repair crew.

On March 22, 1977, the deceased had returned to the repair crew which was assigned to rig a boom on a crane. The night before he had complained that he was unable to sleep because of pain in his arms. The rigging of the boom required that steel cables weighing approximately 80 pounds be joined by an adapter weighing approximately 40 pounds. This operation required two men and the deceased was being assisted by Rene Arrietta. Arrietta was one of the Mexican–Americans the deceased had complained about "not putting out." During the joining operation, a fellow employee, Jim Kelly, noticed that the deceased and Arrietta were having difficulties in completing the joinder. He described the demeanor of the deceased as "you could tell he was–he might have been mad or something, you know. He was just, he was just working real fast and all and hard and trying to get–he was frustrated more or less." Kelly then assisted in completing the job.

Gail Spendlove, leadman of the crew, noticed the deceased's reaction to Arrietta's work:

Q. Did something occur on that day that caused you to believe that he thought that Rene [Arrietta] had let down his part of doing something?

A. Well, not necessarily, just my feeling. He didn't say anything. His actions.

Q. Like what?

A. He got mad. And that's the only thing he could get mad at that quick.

At approximately 10:30 a. m., after the joining operation was completed, the deceased said he was going home. He got off the boom and lay down, at which point the other employees realized he was ill. An ambulance was called and he was pronounced dead on arrival at the hospital at 11:47 a. m.

An autopsy performed by Dr. Louis Hirsch that same day revealed that the cause of death was a myocardial infarction due to occlusive arteriosclerotic coronary artery disease. The autopsy further revealed that a four or five month old scarring existed on the heart muscle, that an occlusion of the right coronary artery existed which was approximately a week old and that the myocardial infarction that resulted in his death had begun approximately 18 hours before death.

Dr. David B. Gurland, a psychiatrist, and Dr. John Wineinger, a cardiologist, both testified that in their opinions the emotional stress generated over a period of time and, in particular, the rage expressed by the deceased on the last day were contributing factors in bringing about the myocardial infarction. Dr. Richard L. Dexter, a specialist in internal medicine, testified that based upon the information he had received, he did not believe the deceased's physical exertion was a contributing factor in the infarction. However, he did feel that the anger and emotional distress were contributing factors.

The petitioner has raised basically four issues:

(1) Does the evidence require a conclusion that the death of the deceased was caused by a specific precipitating event (rage) on the date of the infarction as compared to a gradual buildup of emotional stress?

(2) Does the evidence require a conclusion that death was the result of physical exertion?

(3) Does the evidence require a conclusion that the deceased was subjected to more emotional stress than his fellow employees?

(4) Did this court correctly determine that in gradual emotional stress/heart attack cases that the emotional stress must be "unusual"?

To sharpen the primary issues we will first dispose of the two evidentiary contentions: whether the hearing officer's finding that physical exertion was not a contribu-

ting factor to the heart attack is supportable; and whether the finding that the deceased's job did not subject him to any different emotional stress than his fellow employees is likewise supportable.

■ Turning first to the physical exertion problem, support for the hearing officer's finding is found in the testimony of Dr. Dexter. The petitioner attacks this testimony on the grounds that Dr. Dexter lacked sufficient background information to form an opinion in this area. However, we have reviewed the information supplied to Dr. Dexter and find it adequately covers the deceased's job description. Moreover, the petitioner does not indicate in what particular the information supplied to Dr. Dexter was deficient.

■ Next, the petitioner contends that the hearing officer's finding that the deceased was not subjected to any different everyday emotional stress than that shared by his fellow employees is not supported by the evidence. Although the petitioner's argument in this regard is somewhat vague, apparently what is contended is that the evidence clearly shows that the deceased, because of his own emotional makeup, experienced greater emotional stress than his fellow employees. In our opinion, under *ASARCO, Inc. v. Industrial Commission, supra*, and *City of Phoenix v. Industrial Commission*, 120 Ariz. 237, 585 P.2d 257 (App. 1978), the test for determining the measure of emotional stress is not a subjective one (i. e., how the employee reacts to the job), but an objective one (i. e., do the duties imposed by the job subject the claimant to greater stress than his fellow employees?). From an · objective standpoint, the deceased's duties as a shovel repairman were not in and of themselves stressful, nor did his particular duties as a member of the shovel repair crew expose him to any additional stress not shared by the other crew members. We find the hearing officer's factual finding in this regard fully supported by the record.

This brings us to the crux of the problem presented by this case—where emotional stress is alleged to have arisen from a specific precipitating event which causally contributes to a heart attack, are the results of that heart attack compensable?

A review of both gradual and immediate emotional stress/industrial injury cases is in order. Emotional stress cases in the workmen's compensation field—whether the emotional stress results in a heart attack or a disabling mental disorder—are extremely difficult. This difficulty arises because of the complexity in relating the resulting injury to an industrially responsible event. Where a workman loses a finger because of an errant piece of machinery, the ascertainable injury and the work—related cause are direct and simple. However, emotional stress may have multiple causes, some work—related, others not so related. We can suffer as much and probably more mental distress over the wayward actions of our children as we do over the harassing actions of an overbearing supervisor at work: Likewise, the mental distress brought about by hounding creditors is medically undistinguishable from the mental distress brought about by an inefficient co—worker.

The dilemma posed by this multiple—caused condition is reflected in the Arizona decisions in the area, some cases treating the issue as one of evidentiary proof (i. e., did the work cause the emotional stress, the decision being based upon the inevitable conflict in the medical opinions on this issue) and other cases turning on the determination that the resulting injury suffered by the emotional stress was not an "accident" within the meaning of the Workmen's Compensation law (in our opinion a pure policy decision).[1] For a case embracing both approaches see *Ayer v. Industrial Commission*, 23 Ariz.App. 163, 531 P.2d 208 (1975) (holding that the Commission's resolution of the conflict in medical opinion as to the lack of

---

1. A.R.S. § 23‑1021 provides in part:

    A. Every employee coming within the provisions of this chapter who is injured, and the dependents of every such employee who is killed by *accident* arising out of and in the course of employment [shall receive compensation benefits].
    (Emphasis supplied.)

a causal relationship between work activities and resulting anxiety, high blood pressure and irregular heart beat was supported by the evidence, but in dicta holding that a disabling mental condition brought about by the gradual buildup of emotions is not an "accident" and therefore not compensable.)

■ Our analysis of the cases leads us to the conclusion that the dividing line between whether the resulting injury is deemed compensable (the factual resolution then being left to medical evidence on causation) or is deemed noncompensable from an "accident" standpoint, depends upon the directness of the relationship between a work precipitating event and the resulting injury.

At the end of the spectrum where compensability is clear are the cases where a work related physical injury is followed by mental illness (conversion reaction). See e. g. Johnson v. Industrial Commission, 17 Ariz.App. 424, 498 P.2d 498 (1972).

Next come the cases where a "startling event" occurs but no immediate physical injury results. This type of case is generally conceded to be compensable. In this category, falls Brock v. Industrial Commission, 15 Ariz.App. 95, 486 P.2d 207 (1971) which held that a workman who is told that he ran over a pedestrian and suffered emotional distress as a result of this revelation, suffered a compensable injury. Larson in his treatise lists other examples of this type of dramatic "startling event" case: a heart attack precipitated by the strain of a cab driver's effort to avoid an accident; and a truckdriver's fright on awakening to find his truck on fire. 18 A. Larson, Workmen's Compensation Law § 38.65 at 7–200 (1980).

In the middle of the compensable/non-compensable spectrum is the case where a gradual buildup of emotional distress resulting in an injury is brought about by an increase in the claimant's normal work activity. Illustrative of this type of case is Fireman's Fund Insurance Co. v. Industrial Commission, 119 Ariz. 51, 579 P.2d 555 (1978) which held that a mental breakdown resulting from the delegation to the claimant of excessive responsibilities was compensable. Also see Thiel v. Industrial Commission, 1 Ariz.App. 445, 404 P.2d 711 (1965) (holding that a heart attack resulting from "extreme pressure" caused by factors in the employment was compensable.)

At the end of the spectrum where non-compensability is clear are the cases where there is neither an articulable work-related event nor an increase in stressful activity but the resulting disability is caused by "gradual emotional stress" related to the employment. Typical of these cases is Sloss v. Industrial Commission, 121 Ariz. 10, 588 P.2d 303 (1978) which held that gastritis and chronic anxiety resulting from the everyday pressures of performing the duties of a highway patrolman were not compensable in the absence of a showing that the work performed exposed the claimant to the "unexpected, the unusual or the extraordinary stress" not experienced by his co-workers. The compensability in Sloss turned not on a lack of medical causation but on the determination that the resulting injury was not an "accident" within the meaning of the Workmen's Compensation Law. See also ASARCO, Inc. v. Industrial Commission, supra (the predecessor of the present case); City of Phoenix v. Industrial Commission, supra; Verdugo v. Industrial Commission, 114 Ariz. 477, 561 P.2d 1249 (App.1977), cert. denied, 434 U.S. 863, 98 S.Ct. 194, 54 L.Ed.2d 137 (1977); Muse v. Industrial Commission, 27 Ariz.App. 312, 554 P.2d 908 (1976).

■ It is important to note that when we approach these outer limits of compensability, the normal rules relating to pure physical injuries, such as gradual injury concepts, the rule that employer takes his employee as he finds him and causation rules stating that the work related activity need not be the "sole" cause if it is "a" cause of the injury, simply do not apply. See Sloss v. Industrial Commission, supra. This leads us to conclude that where the work activity is merely part of the overall emotional stress to which all individuals are subjected through the living process, a policy decision

in favor of non–compensability is made. Thus, the requirement in these types of cases that the emotional stress be "unusual or extraordinary" merely reaffirms the necessity of at least pointing to an articulable work–induced incident which gave rise to the emotional stress, which stress by its nature can be caused by numerous factors, the majority of which are non–industrial in nature.

▪ With this analysis in mind, we turn to the issue of compensability raised by this case. Insofar as the medical evidence showed that the deceased's myocardial infarction was the result of a gradual buildup of emotional stress, the hearing officer's finding that the job–related stresses experienced by the deceased were no greater than those experienced by his fellow employees correctly led to his conclusion that the deceased's heart attack was non–compensable. This is so, not only because of the application of principles of "law of the case", but by what we perceive to be the guiding policy decisions in this area.

▪ The petitioner, however, points to a specific work related incident, the rage of the deceased generated by what he perceived to be the inefficiency of a co–employee, in arguing that an articulable work–induced incident occurred resulting in an "accident", the resolution of which is then left to medical causation opinions.

We first note that the rage experienced by the deceased does not fall into the "startling event" category previously discussed. Rather, the rage was generated by the deceased's underlying psychiatric makeup reacting to what was a routine work operation.

▪ We next note that there was nothing in the work activity on the day of death by way of increased responsibility or pressure which produced the deceased's mental reaction to his co–employee's efforts so as to fall within the concept of increased responsibilities found in the *Fireman's Fund* line of cases. What we have then is not the job creating the emotional stress, but the emotional stress being created by the de-

ceased's reaction to the job. Under these circumstances, the relationship of work to the resulting emotional stress becomes so tenuous as to melt the emotional stress into the overall emotional makeup of this individual and lose its injury–by–accident character.

The award denying compensability is affirmed.

CONTRERAS, P. J., and OGG, C. J., concur.