660 P.2d 874

**Joyce E. FINDLEY, Widow, Richard Z. Findley, Deceased, Petitioner,**

**v.**

**The INDUSTRIAL COMMISSION OF ARIZONA, Respondent,**

**Arizona Brick Company, Inc., Respondent Employer,**

**State Compensation Fund, Respondent Carrier.**

**No. 1 CA–IC 2686.**

Court of Appeals of Arizona, Division 1, Department C.

March 3, 1983.

274

Dee Dee Samet, P.C. by Dee Dee Samet, Tucson, for petitioner.

James A. Overholt, Chief Counsel, The Indus. Com'n of Arizona, Phoenix, for respondent.

Robert K. Park, Chief Counsel, State Compensation Fund, Phoenix, Fred R. Sands, Tucson, for respondent Employer and respondent Carrier.

## OPINION

JACOBSON, Presiding Judge.

In this review of an Industrial Commission award the central issue is whether the deceased's suicide was compensable under the Workers' Compensation Law. We find that it was and set aside the award of the Industrial Commission.

The deceased, Richard Z. Findley, was the manager and 10% owner of respondent employer, Arizona Brick Company ("Brick Company"). In 1978 a new kiln system was installed at the Brick Company in order to increase efficiency and to make the business more profitable. However, everything that could possibly go wrong with the new kiln did. The Brick Company was unable to successfully sue the manufacturer and the solution to producing marketable bricks seemed impossible.

As manager and primary mover in obtaining the new kiln, the deceased had total responsibility for solving these problems and was on constant call no matter what time of day or night. As a result he was working at the plant 17 to 18 hours a day, often 7 days a week.

In April, 1980 the deceased suffered a heart attack and was hospitalized. Because of this his doctor directed him to cut back his work hours to only six hours a day. At the time of his death, deceased's heart problems were not a factor in his overall health picture.

Due to the continuing problems with the kiln, the Brick Company suffered financial difficulties for which the co-owners placed responsibility on the deceased. Additionally, a job at the University of Arizona, for which the company was providing bricks, had to be shut down for several weeks as a result of the delay in delivery of bricks. Because of all of these difficulties, the deceased was constantly involved in placating customers. Customers were also cancelling orders. In addition to these problems, the deceased was faced with the constant turnover of employees, absenteeism and lack of employee diligence on the job.

The day before deceased's suicide, there was a meltdown in the kiln, due to a malfunction, resulting in seven burner blocks being ruined. This happened when the Brick Company was still trying to supply bricks to the University job that had previously shut down. The company was without money to acquire new burners and in any event it would take 30 days to acquire new burners.

Also, on the day before deceased's suicide, some electrical boxes blew out and deceased was engaged all morning dealing with this problem. The boxes had to be replaced but it would take one or two weeks to receive them. The lack of electrical boxes meant

that production would have to shut down until the boxes arrived.

During the last year of his life, the deceased had become more and more short tempered, and easily upset. Despite his doctor's orders to work only six hours a day, he continued to work longer hours and was still called at all times of the day and night because of the problems at the Brick Company.

On August 21, 1980, deceased came home from work around noon or 1:00, which was his normal routine since his heart attack. Generally, the deceased would take a drink to calm him down followed by a nap, which he did on this day.

On this date, however, deceased had only been asleep a short time when he received a call from work. Petitioner, Mrs. Findley, testified that deceased became very upset during the phone call and started yelling. The gist of the yelling was that they couldn't do anything at the Brick Company without him. Deceased started tearing at furniture, breaking a table and chairs. As a result of this behavior, Mrs. Findley sneaked out the front door as soon as she was able.

The deceased later called his son, saying: "No matter what happens, Stuart, remember I love you." The family drove back to the house and found that deceased had shot himself.

The petitioner filed a claim for death benefits, alleging that her husband's suicide was compensable under Workers' Compensation Law. After respondent insurance carrier issued its Notice of Claim Status denying the widow's claim, and a timely protest, hearings were held.

At the hearing, the doctors who treated deceased at various times since January, 1978 testified that deceased spoke to them about the stressful situation at work and the long hours he had to put in. Further, they observed the deceased to be tense and agitated and that he experienced angina when back on the job but none when he wasn't. There was no testimony as to other stresses outside of work. All of the doctors who testified at the hearing testified that in their opinion the stress at work was a contributing factor to the suicide, with two stating it was a substantial contributing cause.

One psychiatrist, Dr. Lewis, testified that to a reasonable medical probability, stress and tension at work resulted in the deceased becoming devoid of normal judgment and dominated by a disturbance of mind causing his suicide. When asked by the carrier's counsel whether deceased's personality was at least as significant as the job stress in causing the suicide, the doctor responded:

I wouldn't agree with that. Given that, for example, I, myself, have a perfectionist personality, and if I had the stresses, if I was subjected to the stresses that this man was subjected to, it would not be because of my basic perfectionist personality, but because of the excessive stresses that I have undergone.

So, I would say, if you wanted a percentage, I would say it was, let's say, 30% based on his perfectionist personality, and desire to overcome all challenges, and 70% because of the unusual stresses he had been exposed to.

Additionally there was lay testimony from co-workers as to the numerous problems at the Brick Company, the deceased's problems with various employees and their job performance, as well as the long hours worked by the deceased.

One co-employee, Edgar Reynolds, testified regarding his employment at the Brick Company as follows:

Q. How long were you employed there?

A. At the plant itself, two years.

Q. Were you employed there at the time Mr. Findley committed suicide?

A. Yes.

Q. Did you take over for him?

A. Yes.

Q. For how long?

A. About three months. That was enough. I just couldn't take the pressure.

After the close of testimony, the Administrative Law Judge issued his Decision upon Hearing and Findings and Award Denying Widow's Claim for Death Benefits.

On review, petitioner argues that she proved her claim by a reasonable preponderance of the evidence and that because all the evidence presented was to the effect that the stress of deceased's job caused his suicide, the Administrative Law Judge erred in denying her claim. Respondents answer that the Administrative Law Judge's findings are supported by the law and evidence.

A.R.S. § 23–1043.01(B) which governs the compensability of mental injuries, states:

B. A mental injury, illness or condition shall not be considered a personal injury by accident arising out of and in the course of employment and is not compensable pursuant to this chapter unless some unexpected, unusual or extraordinary stress related to the employment or some physical injury related to the employment was a substantial contributing cause of the mental injury, illness or condition.

■■■ Petitioner challenges the constitutionality of this statute on equal protection grounds because it provides different standards of proof for all other industrial claimants as opposed to those with a mental injury or illness due to stress.

However, it is well settled by the Arizona Supreme Court that the equal protection and due process clauses are satisfied if all persons within a class are treated alike, *State ex rel. Babbitt v. Pickrell,* 113 Ariz. 12, 545 P.2d 936 (1976) and if there exists reasonable grounds for such a classification, *In re Maricopa County, Juvenile Action No. J–72804,* 18 Ariz.App. 560, 504 P.2d 501 (1972). Here, all members of a class, those with stress-related mental injuries or illnesses, are treated equally by the statute. We further find that the classification is reasonable, based upon the nature of these cases, that is, the difficulty in showing a definite causal connection between work related stress and mental illnesses or injuries. This difficulty has been examined previously by this court in *Archer v. Industrial Commission,* 127 Ariz. 199 at 203, 619 P.2d 27 at 31 (App.1980), in which we stated:

Emotional stress cases in the workmen's compensation field—whether the emotional stress results in a heart attack or a disabling mental disorder—are extremely difficult. This difficulty arises because of the complexity in relating the resulting injury to an industrially responsible event. Where a workman loses a finger because of an errant piece of machinery, the ascertainable injury and work-related cause are direct and simple. However, emotional stress may have multiple causes, some work-related, others not so related. We can suffer as much and probably more mental distress over the wayward actions of our children as we do over the harassing actions of an overbearing supervisor at work: Likewise, the mental distress brought about by hounding creditors is medically undistinguishable from the mental distress brought about by an inefficient co-worker.

Given the difficulty in proving the causal connection between mental illness and the work place, the legislature could constitutionally provide a more stringent proof classification for these types of injuries. We therefore find A.R.S. § 23–1043.01(B) constitutional.

■■■ The next question presented is whether the claimant has medically proven the statutory prerequisite for compensability, that is, that the job related stress of the deceased was a "substantial contributing cause" to the deceased's mental imbalance and whether the stress suffered by the deceased was "unexpected, unusual or extraordinary". Our reading of the findings by the Administrative Law Judge inferentially concludes that both these elements were proven and on review we find the evidence supports these findings. Dr. Winkler's testimony clearly provides the "substantial" requirement and there is simply no contradicting evidence that the stress placed upon the deceased was not unexpected, unusual or extraordinary.

However, the deceased's death was the result of suicide. A.R.S. § 23–1021(A) specifically excludes from industrial responsibility injuries which are "purposely self-inflicted". In determining whether a suicide is a "purposely self-inflicted" injury, the rule in Arizona and elsewhere is

> that where the original *work-connected injuries* suffered by the employee result in his becoming devoid of normal judgment and dominated by a disturbance of mind directly caused by his *injury* and its consequences, . . . the self inflicted injury cannot be considered "purposeful" within the meaning and intent of the Workmen's Compensation Act. ·

*Graver Tank & Mfg. Co. v. Industrial Commission,* 97 Ariz. 256, 260, 261, 399 P.2d 664, 668 (1965) (Emphasis added).

Again, the medical testimony is uncontradicted that at the time of the deceased's suicide he was devoid of normal judgment and dominated by a disturbance of mind resulting from his work related stress. The Administrative Law Judge inferentially found this fact to be proven.

The denial by the Administrative Law Judge of compensability in this matter is based upon his legal conclusion that:

> A review of all the Arizona appellate decisions relating to suicide reveals without exception that the decedent had experienced work related injuries, physical or mental, *prior* to their suicides. (Emphasis added).

The Administrative Law Judge then concluded factually:

> [T]here is no evidence that the deceased was suffering from a mental or emotional illness *prior* to his suicide which was brought about by his work. (Emphasis added).

█ In our opinion the legal conclusions reached by the Administrative Law Judge do not logically follow. While admittedly most suicide cases have their genesis in a prior physical or mental "accident", it does not necessarily follow that such a "prior" incident is the sine qua non of compensability. A.R.S. § 23–1043.01(B) now classifies a mental illness or condition as a "personal injury by accident arising out of and in the course of employment" if the statutory prerequisites are met. The manifestation of the mental illness or "personal injury" and the consequences of that "injury", that is, suicide, may occur simultaneously. What is legally material is that the claimant suffered a work related mental disorder, cognizable under A.R.S. § 23–1043.01(B), which results in a compensable event. In this sense, it is immaterial whether the employment stress related mental disorder resulted in a breakdown and inability to work or a suicide. Both consequences are compensable as flowing from his "injury".

█ In this case the evidence, as found by the Administrative Law Judge fully establishes that the deceased had a "personal injury arising out of and in the course of his employment" under A.R.S. § 23–1043.01(B). Moreover, that personal injury was such as to make his ensuing suicide not "purposely self-inflicted". From these findings, an industrially related compensable event occurred for which his widow is entitled to compensation under the law. In this regard, the fact that the manifestation of his work related injury occurred at home is of no consequence and we reject the carrier's contention that the situs of the manifestation is material in determining whether the "injury" arose out of and in the course of employment.

Award set aside.

CONTRERAS and BROOKS, JJ., concur.