797 P.2d 711

**Maria De Jesus AGUIAR, Petitioner,**

v.

**The INDUSTRIAL COMMISSION OF ARIZONA, Respondent,**

**Power Produce, Respondent Employer,**

**Paula Insurance Company, c/o Pan American Underwriters, Respondent Carrier.**

**No. 1 CA–IC 88–122.**

Court of Appeals of Arizona, Division 1, Department D.

April 12, 1990.

Review Denied Sept. 18, 1990.

Ely, Bettini & Ulman by J. Wayne Turley, Phoenix, for petitioner employee.

Anita R. Valainis, Chief Counsel, Industrial Com'n of Arizona, Phoenix, for respondent.

Spencer K. Johnston, Phoenix, for respondent employer & carrier.

## OPINION

FIDEL, Judge.

The Industrial Commission denied a widow's claim for benefits on the basis of a cardiologist's opinion that the deceased employee's myocardial infarction and cardiac arrest were unrelated to his work. We conclude upon appeal that the cardiologist's testimony was invalid because it was grounded in the premise that ordinary labor cannot cause heart attacks, a premise that our legislature has rejected in A.R.S. § 23–1043.01(A).

## FACTS

Pablo Aguiar, a 58–year old farm worker, died on September 26, 1986, after a sudden onset of chest pain while harvest-

ing lettuce for Power Produce, the respondent employer.

The harvest began between 7:00 and 8:00 a.m. Weather and field conditions were good. Lettuce pickers work in groups of three, two cutters and one packer, rotating tasks throughout the day. On this morning, Mr. Aguiar had been working as a packer for about one hour. A packer carries loads of empty boxes to the harvest area, follows the cutters, and packs 24 heads of lettuce in each box. Other workers (loaders) load full boxes onto trucks. Packing involves repetitive bending and stooping. Each empty box weighs approximately 2.5 pounds.

Mr. Aguiar had carried two loads of 10 to 20 boxes to the harvest area that morning. Whether he had also packed some boxes was disputed, but the administrative law judge concluded that he had done so. While carrying the second load, Mr. Aguiar experienced sudden and severe chest pain. His co-workers offered immediate medical assistance, but he chose to rest instead. About an hour later, when his condition noticeably worsened, he was driven toward a hospital but died en route.

No autopsy was performed. Mr. Aguiar's medical history included hypertension and diabetes. While these, like his age and sex, were risk factors for heart disease, there was no evidence of prior heart-related treatment or complaints.

### EXPERT TESTIMONY

Two cardiologists testified at the Industrial Commission hearing. Paul D. Anderson was called by the widow. Herschel M. Richter was called by the respondents. Both doctors agreed that the probable cause of death was cardiac arrest resulting from myocardial infarction, that this infarction probably resulted from underlying cardiovascular disease and a blood clot, and that the underlying disease was unrelated to Mr. Aguiar's work. The doctors disagreed, however, whether the clot formation was work-induced.

Dr. Anderson testified that the two were related:

First of all, I think that Mr. Aguiar had significant coronary disease in place when he went to work that morning, and that that arteriosclerotic coronary disease ... itself, was not work related. But as he was working that day, and I understand that he was packing for two men who were cutting, as he did that heavy work, he extended himself beyond what his heart was capable of performing. And that led to a disproportionate amount of blood supply at the heart as compared to its needs. That leads to an unstable situation which can, and in this particular case, [did] lead to, most likely, a formation of a clot closing off the artery, unstable cardiac rhythm situation, and cardiac death.

Dr. Richter offered a contrary opinion, which we will examine in detail in the following portions of this opinion. The administrative law judge concluded on the basis of Dr. Richter's opinion that work activities had not substantially contributed to the cause of Mr. Aguiar's death. Compensability was denied, the award was affirmed on administrative review, and this special action followed.

### FACTUAL SUFFICIENCY OF DR. RICHTER'S OPINION

Mrs. Aguiar first contends that Dr. Richter's opinion was legally invalid because it was based upon an inaccurate factual assumption concerning the extent of Mr. Aguiar's work on the morning of his death. Dr. Richter testified on direct examination that he thought Mr. Aguiar's only work had been to carry two loads of boxes. The administrative law judge found that Mr. Aguiar had also done some packing.

■ An accurate factual foundation is a necessary element of a legally sufficient opinion. *Desert Insulations Inc. v. Indus. Comm'n*, 134 Ariz. 148, 151, 654 P.2d 296, 299 (App.1982). However, any factual inaccuracy in Dr. Richter's assumptions during direct examination was cured during cross-examination when, in the course of a hypothetical question, Mr. Aguiar's packing ac-

tivities were described in extensive detail. This exchange followed:

APPLICANT'S ATTORNEY: If you assume that level of physical activity [a level that included packing as well as carrying], are you prepared to say that the work activity had no causal relationship whatsoever to Mr. Aguiar's death?

DR. RICHTER: Well, in these matters you have to form an opinion and since he was used to working at this rate—that's my assumption—for a number of years—I don't suppose he packed lettuce any quicker at Willcox than he did anywhere else—I would still feel that this was a usual activity for him and that his illness was not related to his work activities.

Q: But are you prepared to say, to a reasonable degree of medical probability, that the work activities had nothing whatsoever [to do with the death] in terms of causative factors?

A: Yes.

In answering these questions, Dr. Richter made it clear that his opinion did not depend on the assumption that Mr. Aguiar had done no packing on the morning of his death. Thus, we find no invalidity to the *factual* assumptions underlying Dr. Richter's opinion. Dr. Richter also made it clear, however, that he considered it a fact of dispositive importance that Mr. Aguiar had been working at no more than a customary level of exertion when his heart attack occurred. We turn to the issue that arises from this testimony.

## STATUTORY INVALIDITY OF DR. RICHTER'S OPINION

Mrs. Aguiar argues that Dr. Richter's opinion was legally invalid because it was grounded in the statutorily invalid assumption that customary labor cannot cause heart attacks. Her argument is based on A.R.S. § 23–1043.01 (1980).

### Compensability for Heart Illness

In 1980, the Arizona Legislature enacted a statute relating to the compensability of "heart-related and mental cases." The pertinent sections of the statute provide:

A. A *heart-related* or perivascular injury, illness or death shall not be considered a personal injury by accident arising out of and in the course of employment and is not compensable pursuant to this chapter unless *some injury, stress or exertion related to the employment* was a substantial contributing cause of the heart-related or perivascular injury, illness or death.

B. A *mental* injury, illness or condition shall not be considered a personal injury by accident arising out of and in the course of employment and is not compensable pursuant to this chapter unless *some unexpected, unusual or extraordinary stress related to the employment* or some physical injury related to the employment was a substantial contributing cause of the mental injury, illness or condition.

A.R.S. § 23–1043.01(A) and (B) (1980) (emphasis added).

These companion provisions are almost identical, and they share the requirement that circumstances related to employment constitute a substantial contributing cause. They differ, however, in one significant respect. The subsection concerning mental cases requires that the contributing cause be "unexpected, unusual or extraordinary"; the subsection concerning heart-related cases does not. We believe that this disparity was a deliberate response to a contemporaneous development in Arizona's workers' compensation case law.

In 1971, this court called for legislative resolution of a dilemma posed in workers' compensation cases by medical disagreement over whether a worker's activity must be unusual to precipitate a heart attack. *Stotts v. Indus. Comm'n*, 15 Ariz. App. 290, 293, 488 P.2d 495, 498 (1971). The court observed that "some members of the medical profession require as a fact that the activity of the workman which gives rise to the heart attack be 'unusual' ... in order to establish the *causal* connection between that activity and the heart attack." *Id.* at 292, 488 P.2d at 497 (emphasis added). Other physicians believe that heart attacks can be precipitated by

customary occupational exertion or stress. The court lamented the "hodge-podge" of inconsistent decisions that resulted from leaving the choice between these schools to case-by-case adjudicative resolution. *Id.* at 293, 488 P.2d at 498.

The question whether customary occupational stress or exertion can precipitate a heart attack is common to many cases. Yet, as we observed in *Stotts,* that question, if submitted as a matter of adjudicative fact, can be inconsistently resolved from case to case, even in cases where the same experts testify, depending on the fortuity of the administrative law judge assigned the case and the school of medical thought that judge finds more persuasive. 15 Ariz.App. at 293, 488 P.2d at 498. Indeed, the same judge might shift schools from case to case from day to day, and yet each time command deference as the fact finder charged to resolve conflicting expert testimony.

*Stotts* concluded by calling on the legislature to impose a policy resolution to the conflict:

> While under the evidence of this case we must affirm the decision of the Industrial Commission, we cannot help but wonder whether the industrial heart attack area is not a proper subject for definitive legislation, so as to bring some order out of the chaos which has resulted from the present statutes and decisions in this crucial area of our workmen's compensation laws.

*Id.*

This call for legislative action remained unanswered by 1979; in that year, however, our court undertook a judicial resolution to the *Stotts* dilemma by adapting a standard our supreme court had recently established for compensation of mental injury or illness. In 1978, the supreme court determined that an emotional condition could only qualify as compensable if proven to "have been produced by the unexpected, the unusual, or the extraordinary stress." *Sloss v. Indus. Comm'n,* 121 Ariz. 10, 11, 588 P.2d 303, 304 (1978). In 1979, this court imposed the same standard in a case where a heart attack was alleged to have been precipitated by emotional stress. *ASARCO Inc. v. Indus. Comm'n,* 122 Ariz. 241, 243, 594 P.2d 107, 109 (App.1979). The following year, we forthrightly explained *ASARCO* as "a policy decision in favor of non-compensability" in cardiac cases involving only usual or customary emotional stress. *Archer v. Indus. Comm'n,* 127 Ariz. 199, 204–05, 619 P.2d 27, 32–33 (App.1980). *See also Bush v. Indus. Comm'n,* 136 Ariz. 525, 527, 667 P.2d 225, 227 (App.1983) *vacated on other grounds,* 136 Ariz. 522, 667 P.2d 222 (1983) ("the focus of our inquiry in *Archer* was to establish certain policy considerations concerning compensability").

*ASARCO* and *Archer* only partially resolved the problem defined in *Stotts;* in each case, the alleged stressor was emotional, not physical. It remained to be seen whether this court or the supreme court would make a similar "policy decision in favor of non-compensability" in heart attack cases involving customary *physical* stress. In 1980, however, the legislature stepped in and enacted A.R.S. § 23–1043.01, which codified *Sloss* but rejected *Archer* and *ASARCO.* As this court recognized in *Bush,*

> [T]he legislature's public policy decision to delete the requirement that stress be "unexpected, unusual or extraordinary" in the heart-related cases, but to retain that requirement in mental cases can be shown by merely comparing subsections A and B of this statute. Thus it is now clear that the declared public policy in Arizona is that stress-related heart attack cases are compensable if the work-related stress "was a substantial contributing cause" of the heart attack, without consideration as to whether the stress was "unusual or extraordinary."

136 Ariz. at 528, 667 P.2d at 228.[1]

### Legislative Fact

■ The question arises whether, after A.R.S. § 23–1043.01(A), expert opinions

---

1. In *Bush* this court overruled *Archer,* acquiescing in the "clear legislative expression of public policy" in A.R.S. § 23–1041.01. 136 Ariz. at 528, 667 P.2d at 228. The supreme court adopted

may be admitted before the Industrial Commission to rebut the *possibility* that customary occupational stress or exertion can cause a heart attack. We conclude that such evidence is statutorily proscribed. To explain our interpretation, we employ the long recognized distinction between legislative and adjudicative fact:

> When a court or an agency finds facts concerning the immediate parties—who did what, where, when, how, and with what motive or intent—the court or agency is performing an adjudicative function, and the facts so determined are conveniently called *adjudicative* facts. When a court or an agency develops law or policy, it is acting legislatively; ... and the facts which inform the tribunal's *legislative* judgment are called legislative facts.

Davis, *Judicial Notice*, 55 Colum.L.Rev. 945, 952 (1955) (emphasis added).[2]

In this case we distinguish the question whether Mr. Aguiar's heart attack was caused by his customary work activities on the morning of his death from the question whether a heart attack *can* be caused by customary work activities. The former is a question of adjudicative fact, requiring a factfinder's case-specific determination. The latter, however, is a question of legislative fact that the legislature has preemptively resolved for all cases by the enactment of A.R.S. § 23–1043.01(A).

We recognize that there continue to be differing schools of medical opinion on the question whether customary work activities can cause a heart attack. In *Stotts*, however, we urged the legislature to "bring some order out of this chaos" and make a policy choice between these schools. The legislature did not respond until we imposed an order of our own—the unusual stress requirement of *Archer* and *ASARCO*. When the legislature rejected that solution in A.R.S. § 23–1043.01, we believe it meant to reverse the order, not restore the chaos.

There is little legislative history on this point. However, the statute itself is "the most reliable evidence of [legislative] intent." *State v. Dykes*, 163 Ariz. 581, 585, 789 P.2d 1082, 1086 (Ariz.App.1990). This statute makes a sharp—and surely deliberate—distinction between emotional illness cases and heart attack cases; it preserves an unusual stress requirement in the former, but eliminates that requirement in the latter. That distinction reflects policy choices, which we interpret in the context of *Stotts* and related case law of that time. In *Stotts* we urged the legislature to remove the question whether ordinary stress or exertion can cause heart attacks from the adjudicative province of inconsistent case-by-case determination. We construe A.R.S. § 23–1043.01(A) as responding to that call. Experts may differ—and the Industrial Commission must resolve the difference through adjudicative fact finding—whether customary occupational stress or exertion was a substantial contributing cause of a given heart attack. But the

---

our reading of the statute, but vacated our opinion, because it disagreed that the policy inherent in the statute could be retroactively applied. 136 Ariz. at 524, 667 P.2d at 224. The supreme court overruled *Archer*, as we had done, but did so on grounds independent of the statute, stating:

> This court has never enunciated a strict requirement that the claimant show "unexpected, unusual or extraordinary" stress in order to recover for a heart attack. In fact, in [*Phelps Dodge Corp. v.*] *Cabarga*, [79 Ariz. 148, 285 P.2d 605 (1955)], we held that where the usual exertion of employment precipitates a heart attack it is, nevertheless, compensable. We see no reason to impose a different requirement in a case involving a work induced emotional stress-related heart injury such as in the present case. A.R.S. § 23–1043.01 as

amended in 1980 resolves the issue for the future. The injury is compensable if the job related stress was a substantial contributing cause of the heart-related injury.
136 Ariz. at 524, 667 P.2d at 224.

2. See also Monahan and Walker, *Social Science Research in Law: A New Paradigm*, 43 American Psychologist 465 (1988). Though the authors write of social science questions, their premise corresponds to that of *Stotts*. The authors distinguish broad research questions that apply to "many people over considerable time and in many places" from case-specific questions of the who-what-where-when variety. The former, they suggest, should be decided precedentially and removed from the case-by-case realm of expert witness battles and inconsistent resolution.

legislature has predetermined for all cases that customary stress or exertion *can* play this causal role.

### Dr. Richter's Opinion

■ Against this background, we consider Mrs. Aguiar's challenge to the opinion of Dr. Richter. She argues, in essence, that Dr. Richter based his opinion that Mr. Aguiar's heart attack was not industrially caused on the fact that Mr. Aguiar was engaged in customary work activities on the morning of his death and on the legislatively precluded assumption that customary work activity *cannot* cause a heart attack.

We examine Dr. Richter's testimony to determine the accuracy of this characterization. Dr. Richter stated that, in the absence of an autopsy, his opinions were based on statistical probabilities. He concluded that the decedent had a heart attack because that is the statistically probable explanation when a middle-aged man drops dead after complaining of chest pains. He further concluded, based on probabilities, that the decedent's heart attack was caused by a clot-induced occlusion of an artery; most heart attacks, he explained, are clot-induced.

Asked whether physical or work activities could contribute toward clot formation, Dr. Richter stated:

> That's not an assumption that I think is well established. I think that ... why a clot occurs at a moment in time is not very well-defined. They occur randomly throughout a twenty-four hour period of time, perhaps peak in the morning hours, and, you know, why you're alive one minute and have a heart attack the next has never been entirely clear; certainly not work-related in most instances.

Dr. Richter then discussed the relatively small number of cases where heart attacks are not caused by clot-related occlusion but by a sudden increased demand on the heart that exceeds the blood supply:

> DR. RICHTER: ... I think that if there was an unusual work activity or unusual circumstances, that that minority possibility would have to be considered.

APPLICANT'S ATTORNEY: ... Are you saying that, in fact, then the degree of work activity does make a difference in your conclusion as to whether it's related to Mr. Aguiar's death in this case?

> A: Well, ... my opinion is based on a series of assumptions. If the facts were different—for instance, we had had an autopsy which showed that he had died of a heart attack but still had a narrowed but open vessel, one would then want to know why he died at that particular moment, whether there was an increase of demand on the heart that exceeded the blood supply. If a clot had formed which cut off the blood supply, that's an entirely different circumstance. It seems hard[er] to relate that to work activity than if, say, he had been running up a hill and had an open coronary artery, although narrowed, and then died at that point. So, I think it would depend on the facts available as to what my opinion would be.

This portion of Dr. Richter's testimony is put forward by respondents in defense of the administrative law judge's acceptance of Dr. Richter's testimony. It demonstrates, respondents argue, that Dr. Richter admitted the *possibility* that customary work activity could cause a heart attack, but would only entertain that possibility over other, more statistically probable assumptions if an autopsy had demonstrated the absence of a clot.

Standing alone, this portion of the transcript might bear that reading. However, at the start of the quoted passage, Dr. Richter stressed that Mr. Aguiar was working at no more than his customary level of exertion, and as inquiry continued he revealed the dispositive importance that he attributed to this fact:

> APPLICANT'S ATTORNEY: ... When you talk about a blood clot, you're saying, I think, that the work activity is not something that causes the blood clot to form, and since you believe Mr. Aguiar died of a blood clot forming, the work activity was not related to this cause of death?

DR. RICHTER: Well, that's one of the reasons. *It also is the work activity did not appear to be out of the ordinary for him.*

Q: But at the time you made your initial assessment in this case you assumed that Mr. Aguiar—the heaviest thing that he lifted on this day was a head of lettuce?

A: Not necessarily. *I felt that his activities at work weren't any different than he had done on any other occasion;* whether he was lifting a head of lettuce or a box, or whatever, that he was accustomed to picking up boxes of lettuce and packing it.

(Emphasis added.)

After these answers, the cross-examiner attempted to probe whether Dr. Richter appreciated the level of exertion that Mr. Aguiar's customary work required. Counsel provided a detailed hypothetical account of the nature of that work and then posed the questions and received the answers that we quoted in the previous section of this opinion:

APPLICANT'S ATTORNEY: If you assume that level of physical activity, are you prepared to say that the work activity had no causal relationship whatsoever to Mr. Aguiar's death?

DR. RICHTER: Well, in these matters you have to form an opinion and *since he was used to working at this rate*—that's my assumption—*for a number of years*—I don't suppose he packed lettuce any quicker at Willcox than he did anywhere else—*I would still feel that this was a usual activity for him and that his illness was not related to his work activities.*

Q: But are you prepared to say, to a reasonable degree of medical probability, that the work activities had nothing whatsoever [to do with the death] in terms of causative factors?

A: Yes.

(Emphasis added.)

By this testimony Dr. Richter essentially ruled out customary work activity as a cause of myocardial infarction. The administrative law judge recognized the issue that such testimony poses, but treated it as follows:

> While it is recognized that applicant's activities need not be unusual to permit compensability, such does not mean one can't accept the opinion of a doctor who finds as *one reason* not to find an employment relationship to death the absence of any unusual stress or work activity over that normally encountered.

(Emphasis added.)

We do not believe that Dr. Richter's testimony can fairly support this interpretation. The absence of unusual stress or work activity was not merely one reason—it was the *dispositive* reason for his opinion. Dr. Richter made clear after repeated questioning that he deemed only one detail significant with respect to the decedent's final work activities—the detail that Mr. Aguiar was "used to working at this rate."

To restate the matter in statutory terms, Dr. Richter testified that Mr. Aguiar's work activity was not a "substantial contributing cause" of his heart attack. This conclusion facially conformed to the standard of A.R.S. § 23–1043.01(A). Dr. Richter based this conclusion, however, on the premise that customary work activity cannot cause a heart attack. This premise conflicted with a preclusive legislative policy determination to the contrary and rendered the causal opinion statutorily invalid. For this reason, the award must be set aside.[3]

We emphasize that it remains an applicant's burden under A.R.S. § 23–1043.01(A) to establish that a particular episode of on-the-job heart attack is substantially attributable to occupational stress or exer-

---

**3.** A different question would be presented by expert testimony to the effect that, although customary stress or exertion can cause a heart attack by triggering acute coronary insufficiency, it cannot do so *through the medium of clot formation.* Whether the underlying policy of A.R.S. § 23–1043.01(A) can accommodate such testimony is not the question of this case; as we have indicated, Dr. Richter essentially ruled out customary work activity as a cause of heart attack by any means. We address only the question before us, leaving other questions until they arise.

tion. Responding employers and insurers may continue to offer expert testimony to the contrary, and the resolution of conflicting causal testimony remains the adjudicative province of the Commission. What may not be accepted, however, is causal testimony grounded in the premise that customary stress or exertion *cannot* cause a heart attack. This question has been preclusively resolved to the contrary in A.R.S. § 23–1043.01(A), and the Commission is bound to accept the legislature's resolution.

## CONCLUSION

For the reasons set forth in this opinion, the decision of the Industrial Commission is set aside, and the matter is remanded for new hearing.

KLEINSCHMIDT, P.J., and SHELLEY, J., concur.